## H. E. TEACHOUT, Appellant, v. I. T. CLOUGH et al., Respondents.

### Springfield Court of Appeals, April 4, 1910.

1. **APPELLATE PRACTICE: Defective Abstract: Supplemental Abstract.** Respondents filed a motion to dismiss the appeal because of defects in appellant's abstract. A brief on the merits was also filed by respondents touching every point raised by appellant. Before the cause was submitted, appellant filed a supplemental abstract curing the defects in the original. *Held*, that this was permissible, and that the motion to dismiss should be overruled.

2. **CONTRACTS: Duty of Parties to Understand.** A written contract is the highest evidence of the terms of an agreement between the parties, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may and probably will pay his money and shape his action in reliance upon the agreement.

3. ———: **Unauthorized Conception of Terms of Contract.** Where parties enter into a written contract, the terms of which are not ambiguous, the rule of law that both parties in making the contract must assent to the same thing in the same sense has no reference to the misconception of a party, which was wholly unauthorized by the language used or the terms of the agreement.

4. ———: **Definition of "Saw Timber."** The term "saw timber" has been often defined and, ordinarily, means growing trees of all varieties from which suitable articles could be made, or which could be used to advantage in any class of manufacture or construction.

Teachout v. Clough.

5. ————: Conveyance of Real Estate: Reservation of "Saw Timber": Meaning of Term. Plaintiff, in compliance with the contract containing the same reservation, conveyed to defendants a tract of land, reserving to himself the "saw timber" thereon for ten years. It appeared that the word "timber" in the contract was changed to "saw timber" at the request of defendant to allow him to cut firewood and underbrush to make the land better for the production of grass. Defendants, on getting possession of the land, began cutting all the "saw timber" except the pine. In an injunction suit to restrain defendants, the issue was, what was intended by the term "saw timber" in the reservation of the contract and deed. Held, that the term as used in the contract, under the evidence, meant timber of all varieties growing on the land that would make logs eight inches in diameter and eight feet in length (at the date of their removal), as determined by Scribner's Lumber and Log Book.

6. ————: ————: ————: Right of Grantor: Indefinite Contract. A grantor of land who reserves and excepts to himself all the "saw timber" on the land for ten years has a right to enter on said land and remove the timber within the ten years. He has an interest in the trees, and the fact that the contract does not individuate the specific trees so that they can be exactly identified does not make it so uncertain and indefinite as to prevent the title to the trees remaining in the grantor, nor prevent a court of equity from protecting that interest.

7. INJUNCTION: Cutting Timber: Solvency of Trespasser. A court of equity may restrain a wrongful cutting of timber, notwithstanding it is not alleged in the petition for the injunction that the trespasser is insolvent. The nature of the property and the inconvenience of suing for numerous trespasses constitute a basis for equitable relief.

Appeal from Dent Circuit Court.—*Hon. L. B. Woodside,* Judge.

REVERSED AND REMANDED (*with directions*).

*E. W. Bennett* and *W. G. Harvison* for appellant.

(1) "Saw Timber," as a matter of law, and in the light of the testimony, embraces all trees of every variety whatsoever, including all species of oak, not less than six inches, and certainly not less than eight

inches at the butt, found on the premises in controversy. 28 Am. and Eng. Ency. of L. (2 Ed.), 536; 26 Am. and Eng. Ency. (2 Ed.), 453; 19 Am. and Eng. Ency. (2 Ed.), 523; 25 Cyc. 1545; Keeton v. Audsley, 19 Mo. 362; United States v. Stores, 14 Fed. 824; Kolloch v. Parcher, 52 Wis. 393; State v. Addington, 121 N. C. 538; Alcutt v. Lakin, 33 N. H. (2 Fogg.) 507; Putney v. Day, 6 N. H. 430; Olmstead v. Niles, 7 N. H. 522; McCauley v. State, 43 Tex. 374; Bustamente v. U. S., 42 Pac. 111; Liu Kong v. Keahialoa, 8 Hawaii, 511. (2) The "saw timber," as defined in proposition one, having been reserved, the title thereto remained in Teachout. The defendants, therefore, should have been enjoined from cutting the same. 13 Cyc., 679.

*Gratia E. Woodside, J. J. Cope* and *W. N. Jordan* for respondents.

(1) In order to support an injunction, the petition should clearly state facts sufficient to show the right of the petitioner, should show title in him and should allege that defendant is insolvent and that the plaintiff has no adequate remedy at law. One out of possession cannot maintain injunction. Powell v. Canady, 95 Mo. App. 713; Gildersleeve v. Oberstolz, 97 Mo. App. 304; Railroad v. Maddox, 92 Mo. 469; Victor Mining Co. v. Mining Co., 50 Mo. App. 526. (2) An injunction is not the proper remedy in this case. High on Injunctions, ch. 17, sec. 695, ch. 6, sec. 339; 22 Cyc., 750; Chouteau v. Railway, 22 Mo. App. 286; 22 Cyc., 855; Consolidated Fast. Co. v. Mfg. Co., 81 Fed. 383. (3) The intent of the parties at the time of entering into the contract will govern in the interpretation of it. Carter v. Foster, 145 Mo. 383; Meyers v. Christopher, 176 Mo. 580; St. Louis B. & L. Ass'n v. Ohert, 169 Mo. 507; Jewelry Co. v. Bertig, 81 Mo. App. 393.

NIXON, P. J.—The parties to this suit were residents of the State of Iowa on March 5, 1909, on which date the appellant conveyed to the respondents some four hundred acres of land situated in Dent county, Missouri. Prior to the execution of the deed, there had been a written proposition between the parties which respondents had accepted, by which it was agreed that the land should be conveyed to the respondents, subject to a reservation in these words: "And timber reserved." Subsequently, on the 4th day of March, 1909, another contract was entered into by which respondents agreed to exchange their seventy acres in Iowa for the four hundred acres in Dent county, Missouri, which contract contained this reservation: "And the *saw timber* on the above land is reserved by the second party for a period of ten years." And on the 5th day of March, 1909, appellant and his wife made a deed, pursuant to the articles of agreement, containing the reservation, "And the *saw timber* on the above land is reserved by the second party for a period of ten years." The controversy in this case arises over this reservation.

After the execution of the deed, the respondents moved to Dent county, and prior to the commencement of this suit, had been cutting trees off the land conveyed to them by said deed, perhaps some sixty or seventy thousand feet in all, and manufacturing it into crossties. Immediately prior to the filing of the suit, the respondents had advertised for fifty men to make ties on this land. The ties were made out of the oak timber, and respondents had been cutting timber off the land which measured from twelve to twenty-four inches in diameter. Some of the timber still growing and uncut on this land would be of that size. The day before suit was begun, an agent of appellant notified respondents not to cut any more timber and they stated that they would unless lawfully stopped. The land was hilly and some of it rocky and none of it was good farming land or in cultivation; it was wild and uninclosed tim-

ber land, and the principal value of the land lay in its timber.

No question was raised as to the right of appellant to the pine timber growing on the land. The testimony tended to show that there was some four thousand feet of timber to the acre still standing on the land, and that it would be worth from one to two dollars a thousand. The amount of the pine timber on the land was estimated at one thousand feet to the acre of the value of two dollars a thousand.

A preliminary injunction was granted on application of the appellant.

At the trial, evidence was introduced by both parties as to the history of the reservation of the timber and explaining why the word "timber" in the preliminary contract was changed to "saw timber" in the deed. On the part of the appellant, the following witnesses testified:

B. F. Burwinkle stated that he was a real estate dealer residing in Des Moines and that respondents listed property with him to be traded for Missouri or Texas land, and which was traded to the appellant, Teachout; that he and W. H. Wilson represented Mr. and Mrs. Clough in making the exchange of the properties, receiving a commission from Clough, and that they did not in any way represent Teachout in the trade.

W. H. Wilson testified that he assisted Mrs. Burwinkle—her husband being away at the time—in making the trade between the parties; that he formulated the terms of the preliminary contract or proposition to Teachout, which, after Clough had signed, was submitted to and executed by Teachout. That afterwards, a second contract was drawn which was signed by Clough and his wife in the office of Burwinkle, but that before executing it, they took it to their attorney and secured his approval, and upon returning said it was satisfactory with the exception that they wanted "saw" put before the word "timber" so as to give them per-

mission to get fire wood off this land, and Clough said, "This will give Mr. Teachout all the timber; in other words, all the saw timber on the land for ten years."

Mrs. Burwinkle stated that the proposition to make the trade was made to Teachout through her. The trade was to the effect that Teachout was to have seventy acres belonging to respondents subject to a four thousand dollar mortgage. Teachout was to reserve all the timber. Afterwards, Clough wanted the privilege to get enough fire wood and it was agreed to put in the words "saw timber," and anything big enough was reserved to Teachout for a period of ten years. When the contract was drawn up and ready to be signed, the word "saw" before the word "timber" was not used, and Clough insisted that it be so used so that he could have a right to use the underbrush for any fire wood he needed, and the word "saw" was written in before the word "timber." Clough said, "If the term 'saw timber' is used, that will give Mr. Teachout all the timber big enough to saw and will reserve me the right to the underbrush and fire wood."

A. E. Fletcher, engaged in the real estate business in Iowa, stated that he met Mr. and Mrs. Clough in Burwinkle's office in March, 1909, and heard a conversation between them about written articles for the trade of land in Dent county which Clough was negotiating for. At first all the timber was reserved in the contract. Clough wanted it changed so he could use the underbrush and fire wood, and the word "saw" was then written in the contract before the word "timber." This was Clough's statement to Wilson, and Wilson said, "We will arrange it by writing in 'saw timber' instead of just 'timber.'"

H. E. Teachout stated that he resided at Des Moines. Upon being shown the preliminary contract with respondents, he stated that he entered into the contract on February 27, 1909; that the contract was presented to him by W. H. Wilson and that he had no

conversation with Wilson about it before he signed it. "I received a deed from Mr. Clough and delivered a deed to him for my property in Missouri under this contract. I read the contract before I signed it and understood the words 'saw timber' to mean all standing timber capable of being sawed into lumber or timber. Neither Mr. and Mrs. Burwinkle nor W. H. Wilson represented me in this matter."

The defense introduced the following witnesses on this question:

"S. D. Clough stated that he formerly lived in Des Moines but now lived in Dent county, Missouri. In the trade with Mr. Teachout, he told me that Wilson represented him. When these papers were drawn up, I understood the term 'saw timber' to mean a pine board twelve inches square or fourteen feet from the ground. I have an envelope which I am now reading from; it was written in Teachout's office in his presence some time before the 2d day of March, 1909. The contract was written with the word 'timber' in it, and I would not sign it with that word unmodified as the contract did not represent the agreement between me and Teachout and I insisted that such contract be incorporated in the contract. Mr. Wilson characterized it as a 'rig-a-ma-role,' and said it would be a laughing stock if it were interlined in the contract in the manner in which I had written it on the envelope. Mr. Wilson said at that time that Mr. Teachout would give me the timber that he agreed to, and I insisted on the entire agreement as written on that envelope being incorporated in the contract. Wilson said, 'I haven't room to write it in the contract and Teachout has already signed it.' Mr. Jordan suggested and asked Wilson if the term 'saw timber' was not universally understood to mean the right to timber stated in the contract between Teachout and I as written upon the envelope. Wilson replied, 'Sure.' There was an agreement between Teachout and myself as to what 'saw timber' meant and Mr.

Teachout said: 'I don't know whether that is called the saw timber or what it is called there, but between you and I we will make it our contract and will stand by it.' At the time the contract was drawn, I said to Wilson, 'I want in there just what Teachout and I have agreed upon,' and he said, 'I'll see that Teachout gives you the timber that he agreed to.' "

I. T. Clough, wife of S. D. Clough, stated that she signed the contract for the purchase of the land in Dent county. "I understood 'saw timber' to mean at the time I signed the contract that they were to have all the timber except the saw pine timber as he called it. I understood it to mean saw pine timber."

W. N. Jordan stated that he was a practicing lawyer in Des Moines and that Clough and his wife and Wilson came to his office in March, 1909. "The contract between the parties is partly in my handwriting and was signed in my office. The deed is not the identical deed that was brought to my office; it was changed in my presence. The word 'mineral' was crossed out and the word 'saw' put in front of the word 'timber.' The change was made by Wilson at my request as a representative of Clough. The word 'mineral' didn't appear in the contract as drawn the night before. The controversy about the word 'saw' lasted perhaps an hour the night before and that question was supposedly settled."

J. G. Myerly, an attorney of Des Moines, testified: "I drew the deed for conveying the land from the defendant to the plaintiff (the Warren county land). About that time, Clough and Wilson were in my office. I understood from what the parties said that the Cloughs were exchanging their equities in seventy acres of land for four hundred acres in Dent county, Missouri. There was something said at the time about saw timber being reserved by Teachout in the deal; that is, saw timber

on the Missouri land. I don't think there was anything said in my presence as to what was to be considered 'saw timber.' "

At the trial, evidence was introduced for the plaintiff and defendants as to the meaning of the term "saw timber." Plaintiff introduced the following witnesses:

G. L. Longshore, of Des Moines, stated that he was engaged in the hardware and lumber business as manufacturer and dealer and had been in that business since 1876 and had for a number of years been engaged in buying standing timber and sawing it into logs. "The words 'saw timber' mean, among men engaged in the lumber business, anything that is suitable in size and length to produce merchantable lumber; anything from eight inches in diameter and up would in my judgment be regarded 'saw timber.' Scribner's Lumber and Log Book is regarded in the United States among men engaged in the lumber business as an authority. This book for the year 1908 recognizes a tree in their scale that will make a log eight inches in diameter at the small end inside the trunk. 'Saw timber' among men engaged in the lumber business includes all kinds of timber. If you were to purchase the 'saw timber' upon a certain tract, under the rules and usages of lumber merchants and buyers, you would get all the timber that would make a log eight inches in diameter and eight feet in length."

D. D. Langton stated that he had been engaged in the lumber business for twenty-five years, and had handled lumber in Missouri, from cutting down trees through all branches of the timber business. "The term 'saw timber' has a defined meaning among lumber people and means trees that are cut into merchantable lumber. From my knowledge and experience in the lumber business, trees that would run from ten inches and up would work into merchantable lumber to an advantage, although we use them as low as eight inches. The words 'saw timber' when you make a purchase of the saw tim-

ber upon a tract of land would include everything that
went as low as eight inches in diameter, and such a
reservation would include all the timber growing upon
'the premises of that size."

J. H. Shiveley who had been in the lumber busi-
ness for twenty-two years, running a mill, cutting logs,
making them into lumber and marketing the lumber,
testified: "The words 'saw timber' have a well-defined
meaning among lumber men, and anything that would
make a four by four is counted saw timber, at least in
my contracts. It would take about a six inch tree to
make a four by four. We have a rule that eight inches
is the smallest scale. The words 'saw timber' mean all
kinds of timber. I have had much experience during
the last two years in Dent and Shannon counties in the
lumber business and we saw all kinds of lumber—oak,
pine, gum, hickory, ash and all kinds that grow on
this land we saw into lumber."

Appellant thereupon introduced in evidence Scrib-
ner's Lumber and Log Book containing the Doyle rule
reciting: "It is customary in measuring logs to take
the diameter in the middle of the log, inside the bark.
This is obtained by taking the diameter at each end of
the log, adding them together and dividing by two. It
is usual to allow on account of the bark, for oak one-
tenth or one-twelfth part of the circumference; for
beech, ash, etc., less should be allowed." The Doyle
rule shows the scale of logs eight inches in diameter,
but does not show measurements in logs of less size.

T. H. Herrington, living part of the time in Dent
county and part of the time in Shannon county, had
been in the saw-mill business eighteen years and was
at the time engaged in the business in the locality of
the land in question. "Among people engaged in the
lumber and milling business, the words 'saw timber'
mean anything from six inches, I reckon. I think it
would have a meaning."

W. J. Cavender of Dent county had been in the saw-milling business about two years. "The term 'saw timber' means anything that would make a four-by-four the way we cut it and it includes pine, oak, ash, gum and anything like that. Anything that would square six inches or eight inches would make a four-by-four or a two-by-four."

J. S. Warfel, of Dent county, who had been in the saw-milling business to some extent, stated: "My understanding is that the term 'saw timber' would include any kind of timber and would mean anything that would make merchantable lumber four-by-four."

E. L. Dye, of Dent county, who had been in the saw-milling business for thirty years, stated: "The words 'saw timber' would include different kinds of oak, but we cut mostly pine. We cut timber down to eight inches." On cross-examination he stated that the words 'saw timber' have no definite meaning "that he knew of, unless you take everything."

The defendants introduced the following witnesses on this question:

S. D. Clough said: "I understand by the term 'saw timber' a board twelve inches square or over, fourteen feet from the ground."

Riley Ritter, of Dent county, who stated that he had worked at the saw-milling business for about five years, said: "I knew what 'saw timber' meant among lumbermen at the time I was at work; it was understood to mean pine timber." He testified on cross-examination: "Q. Do you mean to say that in March, 1909, you had no knowledge of what the term 'saw timber' meant among lumbermen in this locality? A. No, sir; I don't understand it; I haven't been in the timber business at that time, but I think since that time they are cutting everything. I don't know that I know anything about it."

Riley Hanning, stated that he had been on this land and that there was oak and pine timber on it, but

he didn't think there was any grade of oak on the land
that was first class to amount to anything. That the
oak timber varied in size, some small and some toler-
ably large. "The words 'saw timber' have a well-de-
fined meaning among lumbermen in this vicinity. Gen-
erally speaking, pine timber is 'saw timber.' Oak tim-
ber right now is regarded as 'saw timber.' "

G. R. Kennamore had lived in Dent county all his
lifetime. "The words 'saw timber' used to have a well-
defined meaning among lumbermen when I lived there.
I don't know what it is today."

A. L. Clinite, in behalf of the plaintiff in rebuttal,
stated that he was secretary of the school board at Des
Moines. That he had known S. D. Clough for about
seven years and that his general reputation in the com-
munity in which he lived was bad.

J. H. Shiveley, recalled, stated that the oak timber
standing on the four hundred acres would run from
two inches up to twenty-four or twenty-five inches in
diameter.

The court found the issues for the defendants and
rendered judgment accordingly, from which the plain-
tiff perfected his appeal.

## OPINION.

Respondents have filed a motion in this court to
dismiss the appeal for the reason that appellant's ab-
stract does not comply with the rules of this court.
Since the filing of this motion and before the hearing,
appellant filed a supplemental abstract which cures
the defects in the original abstract. This was permis-
sible. [Davis v. Carp, 139 Mo. 654, 123 S. W. 1009;
Ricketts v. Hart, 150 Mo. 64, 51 S. W. 825.] And this
is especially true where, as here, respondents have
briefed the case on the merits, touching every point
raised by appellant, and were not put to any additional
expense or trouble in preparing a new brief or taking

any other step in the case in consequence of the amendment of the abstract. [Diggs v. Wabash R. Co., 131 Mo. App. 457, 110 S. W. 9.] The respondents' motion to dismiss is therefore overruled.

As shown by the evidence in this case, all the parties to this action at the time the contract was entered into were residents of the State of Iowa. The preliminary negotiations were made by Clough, who made the following proposition to the appellant on February 27, 1909:

*"Mr. H. E. Teachout.*

"Dear Sir: I submit to you the following proposition: 70 acres in Warren county, Iowa, . . . for the following land . . . containing 400 acres in Dent county, Missouri, subject to $800 at 6% and timber reserved . . . .

"Accepted March 2, 1909.

"S. D. CLOUGH,

"H. E. TEACHOUT."

Following up this proposition, the parties entered into a contract on March 4th in which the respondents agreed in more formal terms to convey seventy acres in Warren county for appellant's four hundred acres in Dent county, with the following reservation: "And the saw timber on the above land is reserved by the second party for a period of ten years." There were several other stipulations in this contract, but they are wholly immaterial so far as this controversy is concerned. Subsequently, on the 5th day of March, the parties, in pursuance of their agreement, executed deeds to each other, the appellant executing his deed to the respondents for the four hundred acres containing a reservation as follows: "And saw timber is hereby reserved for a period of ten years."

As will be seen, the controversy in this case turns upon the interpretation and effect of the reservation by appellant of the "saw timber" upon the four hun-

dred acres in Dent county. We have given the evidence of the respective parties in our statement, showing the circumstances contemporaneous with the making of the several contracts and showing the change in the terms of the reservation from "and timber reserved" in the original proposition, to "and saw timber is hereby reserved for a period of ten years" in the deed. The evidence offered as to this change showed by an overwhelming weight of the testimony by disinterested witnesses of character and standing as well as by the agents of respondents themselves, that this change was made at the request of the respondents so as to enable them to get fire wood off the land and give them the right to cut down small trees and underbrush for the purpose of clearing up the land that it might be better adapted to produce grass. We do not think it would serve any good purpose or that it is in any way required in order to arrive at this conclusion that we should take up the testimony of each witness and separately examine it as to weight and credibility. The evidence is so clear and satisfactory, when considered together, that it is not susceptible of two interpretations.

The respondents, after a somewhat prolonged negotiation, with the assistance of their agents and attorneys, executed the written contract, and being fully apprised at the time of the language and terms of the contract, they cannot now be heard to complain that the contract did not express their intention. A written contract is the highest evidence of the terms of an agreement between the parties, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement. He owes it to the public which, as a matter of public policy, treats the written contract as a conclusive answer to the question. What was the agreement? [9 Cyc. 388.] The terms of the

agreement in this case are not ambiguous, and the rule of law that both parties in making the contract must assent to the same thing in the same sense has no reference to the misconception of a party which is wholly unauthorized by the language used or the terms of the agreement.

In this case, the words "saw timber," as used by the parties in their written agreement, bear on their face a very intelligible meaning and only one meaning, and express very clearly the intention of the parties that the reservation should cover all trees fit for sawing; and these words would be readily understood by a man of average intelligence to mean all timber suitable for sawing or milling purposes; that is, such timber as could be sawed up and made into merchantable lumber. The term has been often defined, and in the light of the testimony and as a matter of law, under the usages of the English language as defined by the standard dictionaries, it means growing trees of all varieties from which suitable articles could be made or which could be used to advantage in any class of manufacture or construction, and includes not only pine trees, but hickory and oak as well as others. [28 Am. and Eng. Ency. of Law, 536; 26 Id. 453; 19 Id. 523; Keeton v. Audsley, 19 Mo. 362; U. S. v. Stores, 14 Fed. 824.]

Numerous witnesses gave evidence in this case as to the meaning of "saw timber" as used by people engaged in the saw-milling and lumber business. This evidence shows that the term has a well-recognized and defined meaning and includes all kinds of timber, oak as well as pine. And while there were some discrepancies in the statements of witnesses as to how large the log must be to make merchantable lumber, varying somewhat according to the different localities, the testimony of George L. Longshore presents the rule covering the consensus of the testimony on this question. He had been in the lumber business in Iowa for over forty years and had many years' experience in buying standing tim-

ber and sawing the same into logs. He stated that these words, among men engaged in the lumber business, mean such timber as is suitable in size and length to produce merchantable lumber, so that a purchase of saw timber under the rules and usages of lumbermen and buyers would entitle the purchaser to all timber that would make a log eight inches in diameter and eight feet in length.

As shown by the uncontradicted evidence in this case, Scribner's Lumber and Log Book containing the Doyle log rule is the recognized authority by men engaged in the lumber business throughout the country, and it gives the diameter at eight inches, and says that the customary way of measuring logs is to take the diameter in the middle of the log, inside the bark; and that this is obtained by taking the diameter at each end of the log, adding them together and dividing by two; that it is usual to allow on account of the bark, one-tenth or one-twelfth part of the circumference. So that applying to this case the rules of law for the determination of the intent of the parties to this contract, the rule of *lex loci contractus*, or applying the other rule, in order to ascertain the intent of the parties, to regard their condition and the objects they had in view in the light of the circumstances surrounding the subject-matter at the time, the words "saw timber," as used in this contract, would mean that the appellant reserved all timber growing on the four hundred acres that would make logs eight inches in diameter and eight feet in length as determined by Scribner's Lumber and Log Book. An examination of the evidence introduced by both plaintiff and defendants, giving the defendants' evidence the most favorable deductions, is equally conclusive.

The reservation of the timber was of such trees as should come up to the above dimensions at the date of their removal, and the title thereto remained by reason of the reservation in the appellant and carried with it

the right to enter and remove the timber within the ten years. [State v. Kempf, 11 Mo. App. 88; Haskell, v. Ayres, 35 Mich. 89; Heflin v. Bingham, 56 Ala. 566; Perkins v. Stockwell, 131 Mass. 529. See also 55 L. R. A. 517 (note).] A sale of all merchantable timber on specified land takes place at once when such timber has answered the description although it may be a question of fact as to what is and what is not merchantable. [Haskell v. Ayres, supra.] A grantor of land who reserves and excepts to himself all the timber suitable to be sawed into lumber or necessary for sawing purposes has an interest in the trees. [Knotts v. Hydrick, 12 Rich. L. 314.] Under the authorities, therefore, the appellant retained his interest in this timber. The objection that the contract does not individuate the specific trees so that they can be exactly identified would not prevent the title to such trees under the authorities cited from remaining in the appellant. The objection that because there is no way of precisely determining the exact individual trees reserved by the term "saw timber" and therefore the whole contract is void is an unnecessary refinement for any practical purpose, especially as applied to the circumstances of this case in which it is shown that the respondents at their own request contracted only for fire wood and for permission to remove the underbrush; and it further appearing that the chief value of the four hundred acres was the saw timber upon it, and that at the time the injunction was procured, respondents had already cut many thousand feet of the timber reserved by the contract and were about to employ a force of fifty men for the purpose of denuding the land of its trees from twelve to twenty-four inches in diameter. To allow the respondents, under their contract, to defeat its whole object because they could not determine the exact size of the trees reserved, would be an intolerable refinement. The maxim, *De minimis non curat lex* applies to such reasoning. To say that equity under these circumstances, when appealed to for

aid, would stand idly by with closed eyes and palsied hands, would be at least a caricature on its golden maxim that it delights in doing justice, and not by halves.

We do not consider the contract in this case to be so uncertain and indefinite in its terms as to preclude a court of equity from enforcing its provisions.

The respondents further contend that under the facts of this case, equity has no jurisdiction because it is not alleged in the petition that the respondents are insolvent, and respondents contend that the only proper remedy for the injury is an action at law for damages as the cutting of the timber was not an irreparable damage.

As was said in the case of Palmer v. Crisle, 92 Mo. App. loc. cit. 513, "The law of today does not require that a person in plaintiff's situation shall submit to the stripping of his timber-land of its forest trees, and then attempt to make his loss good by action for damages. The nature of the property involved and the inconvenience of suing for continuing trespasses, as charged in this case, constitute a basis for equitable relief, long recognized in this State under the statute governing the use of the writ of injunction." See also sec. 3649, Ann. St. 1906; Eckelkamp v. Schraeder, 45 Mo. 505; Lytle v. James, 98 Mo. App. loc. cit. 341, 73 S. W. 287; Sills v. Goodyear, 80 Mo. App. loc. cit. 133. "The general rule is that the cutting of timber is such a destruction to the inheritance as will cause a court of equity to interfere to restrain the trespass." [22 Cyc. 832.]

It follows that the judgment should be reversed and the cause remanded, with directions to the trial court to enter an order permanently restraining the respondents, prior to the 5th day of March, 1919, from cutting any timber—whether oak or other timber—on the four hundred-acre tract of land described in plaintiff's petition, of such dimensions that at the time of cutting will make a log eight inches in diameter and eight feet in

length or longer as determined by Scribner's Lumber and Log Book for the year 1908, and that the appellant recover costs of suit.   All concur.