## Casselberry v. Stair

*M. J. Maggio* and *S. Dale Furst,* of *McCormick, Herdic & Furst,* for plaintiff.

*John C. Youngman,* for defendant.

LARRABEE, P. J., October 20, 1938.—Mary A. Casselberry, a resident of Hillsgrove Township, Sullivan County, Pa., entered into a written agreement with Arthur Stair, wherein she sold to him the timber growing on a tract of 180 acres, part of which was situated in Hillsgrove Township, Sullivan County, and part in Shrewsbury Township, Lycoming County. In this written agreement nothing is said about limiting the size of trees to be cut. The property conveyed is described simply as "a tract of timber". The word "timber" appears in two other places in said agreement, to wit: where it was agreed that the "timber" was to be removed within four years from the date of the agreement, and where the grantor agreed to permit the grantee to remove the "timber" from the tract without any claim for damages to the land.

No other language appears in this written agreement, explaining or in any manner describing what is intended to be included in the word "timber".

Defendant entered upon said tract and proceeded to cut and remove the larger trees therefrom, and subsequently began cutting off the smaller trees having a diameter of less than six inches at the top end of the butt log. Whereupon plaintiff obtained a temporary injunction for the purpose of restraining defendant from cutting trees of less than six inches in diameter at the top end of the butt log. Plaintiff alleged that at the time the written agreement was entered into defendant made an oral agreement with her that he would not remove any trees of less diameter from the tract.

Defendant denied ever having made such a contemporaneous parol agreement.

Hearing was duly had on plaintiff's bill to make the injunction permanent, at which time defendant contended it was his understanding of the written agreement that he was to have the right to cut and remove any trees whatsoever growing on said tract regardless of their diameter and showed that his principal business was that

of manufacturing and selling mine props, as well as furnishing pulp wood for manufacturing paper.

Plaintiff in support of her position contends that the word "timber" standing by itself in this written agreement without being otherwise qualified in any way is intended to mean only such logs as are of the diameter of six inches or greater at the top end of the butt log.

The plaintiff produced witnesses who were experienced in the lumber business in Pennsylvania, who testified that the word "timber" included only such logs as were six inches or more in diameter at the top end of the butt log.

In contradiction of this testimony the defendant produced witnesses having several years' experience in the lumber trade who testified that throughout central Pennsylvania the term "timber", as used in the trade, is intended to comprehend trees of every kind growing on a tract, regardless of size, and such as are salable, and that the smaller size trees are available for use as mine prop timber and pulp wood.

The court found, from the preponderance of the testimony, that the word "timber" was intended to include trees of all kinds growing on said tract regardless of their diameter.

There appears to be but one decision by the appellate courts of Pennsylvania in which the term "timber" has ever been construed, and that one is not helpful in passing on the present controversy, in view of the changed conditions resulting from our modern industrial development as it affects the use of wood for various purposes other than constructing buildings. In Kaul v. Weed, 203 Pa. 586, plaintiff, in the year 1890, by deed granted to Weed " 'All . . . interest of, in and to all and all manner of timber down and standing, save and except the hemlock timber . . . on . . . certain . . . tracts of land' ", situate in Elk County. However, it is not disputed that there was an understanding between the parties to that agreement at the time it was executed

that in cutting over said tract the minimum size for certain hardwood timber was eight inches in diameter "at the top end of the butt log", and for soft woods 10 inches, as that appeared to be the custom in the lumber trade in the particular region where the tracts of land were situated. The purchaser, Weed, forthwith entered upon the land and proceeded to cut and remove the trees of the diameter mentioned. Several years afterwards he re-entered the tract and began cutting trees of smaller diameter than those mentioned, whereupon the grantor brought an action in trespass for the wrongful cutting of said trees. The purchaser, in justification of his action in cutting trees of lesser diameter than those originally agreed upon, contended there was a market for them for chemical wood purposes as well as for pulp wood. However, the trial court found, as a fact, that at the time said agreement was entered into, in 1890, there were no factories in central Pennsylvania using so-called chemical woods or making paper from pulp wood, and ruled that as there was no market available for such smaller sizes, at the time the contract was entered into, the parties could not have had in mind that trees of smaller diameter could be cut from the tract. It is clearly implied in the court's findings that appellant's contention that he was entitled to cut smaller sizes for pulp wood was an afterthought arising from the fact that a new market had been created in that section for these smaller sizes. It is also indicated in the court's opinion that, had there been chemical factories and paper manufacturing plants in that section of Pennsylvania at the time the contract was entered into, the court would have found that Weed intended the cutting of smaller sizes for pulp wood, at the time he entered into the contract, and would have ruled that the smaller sized trees were intended to be included in his purchase of timber.

It was further found by the trial court in Kaul v. Weed, that the timber that was first cut from the tract, and of the diameters stated, was in accordance with specific in-

structions from the grantee, thus showing that the parties at the time the agreement was entered into clearly understood what size trees were to be cut.

The Supreme Court, in affirming the lower court, said:

"The conclusion cannot be avoided that the appellants would not be insisting that trees, which they manifestly did not regard as timber at the time of their purchase, should now be regarded as such, if in the meantime the wood had not acquired value for purposes for which timber, either in the legal or common acceptation of the term, has never been used."

No other cases, construing the word "timber", were cited in the briefs submitted. However, the court in making its investigation of cases decided in other jurisdictions, found decisions which, under our modern industrial conditions, are helpful in interpreting the word "timber".

In the past 30 years plants have sprung up throughout the State of Pennsylvania for the manufacture of products from so-called chemical woods, as well as paper from pulp wood, thereby creating an available market for trees of lesser diameter than six inches, and such as can be used in the process of making chemicals and paper. Tracts of timber situated in northern central Pennsylvania are located near the coal mining fields and therefore a market is available for mine prop timber for which it was testified that logs of a diameter of less than six inches at the top end of the butt log are frequently used. In fact defendant here testified that his principal business was "mine prop business". In this connection we also note that at the time the written agreement was made in the instant case there was a large paper-making mill located at Lock Haven, Pa., approximately fifty miles from the site of this timber tract and readily accessible as a market for pulp wood.

In Great Southern Lumber Co. v. Newsom Bros., 129 Miss. 158, 166, 91 So. 864, the appellate court of Mississippi said:

"Years ago, when practically the only use made of timber was to manufacture it into lumber, it was then held that merchantable timber was only those large sticks of wood squared or capable of being squared for building houses or vessels. Since which time, however, the uses of timber have multiplied; among other things is now that of manufacturing small timber into paper. We have these paper mills scattered over the country, and in their vicinity there is always a market price for this small timber which can be manufactured into paper. This is well expressed in the opinion of the court in the case of *United States* v. *Stores*, 14 Fed. 824, where it is said: 'But the numerous uses to which wood has come to be applied, and the general employment of all kinds of trees for some valuable purpose, has wrought a change in the general acceptation of terms in connection therewith, and we find that Webster defines "timber" to be "that sort of wood which is proper for buildings or for tools, utensils, furniture, carriages, fences, ships, and the like." ' . . .

"At the time the plaintiffs purchased this timber, the small timber was salable and had a market value as paper wood or pulp wood timber; that is, timber suitable to be manufactured at a paper mill into paper. Under this testimony we therefore conclude that this small timber was merchantable timber, and therefore the title to it passed to the appellees under their deeds."

In Kerl v. Smith, 96 Miss. 827, 51 So. 3, the appellate court held that the use of the word "timber" in a contract relating to timber, with nothing further to explain what kind of timber was meant, was not so accurate a designation of what was sold as to preclude investigation as to what was meant by it in the contract.

In Great Southern Lumber Co. v. Newsom Bros., supra, the court referred to the case of United States v. Soto, 7 Ariz. 230, 64 Pac. 419, where "timber" was defined as including all kinds of wood used either for building purposes or in the manufacture or construction of

useful articles. For other decisions of like effect see Teachout v. Clough et al., 143 Mo. App. 474, 127 S. W. 672, Nash et al. v. Drisco, 51 Me. 417, and United States v. Stores et al., 14 Fed. 824.

In Nettles et al. v. Lichtman et al., 228 Ala. 52, 152 So. 450, 91 A. L. R. 1455, the court said:

"In recent years paper mills have been established in this state . . . and a market thereby created for 'all woody plants suitable for paper mill or pulp stock,' measuring less than eight inches in diameter at the stump twelve inches from the ground."

In interpreting the word "timber", we may also take into consideration the occupation of the parties to the written agreement, in the instant case, as having some bearing on what their intentions were when they used the word "timber" in this written agreement.

In Pennington v. Avera, 124 Ga. 147, 52 S. E. 324, the appellate court of Georgia, construing a contract where the word "timber" was in controversy, said:

"The meaning to be given to the term depends upon the connection in which it is used, and sometimes upon the occupation of the person who uses the term. In construing a contract where the word [timber] appears, it is not only proper, in determining what is intended by the parties, to look to the terms of the contract, but also the occupation of the contracting parties, and the purpose for which the contract was entered into."

Applying this latter principle to the instant case, we find that it is undisputed that the business of the purchaser of said timber was that of manufacturing and selling mine props. It is in evidence that mine timber is manufactured from trees of relatively small diameter, some of it under six inches in diameter at the top end of the butt log, and this lends some strength to the contention of defendant that the word "timber" was intended to include trees of all kinds and sizes.

We find other authority for the admissibility of testimony to explain trade terms. In the case of Hurst v.

Lake & Co., Inc., 141 Ore. 306, 16 P. (2d) 627, 89 A. L. R. 1222, it was held that members of a trade or business group who have employed in their contracts trade terms are entitled to prove that fact and show the meaning of those terms, to assist the court in the interpretation of such contracts. There the court quoted from 5 Wigmore on Evidence (2d ed.) sec. 2463, where that authority states (p. 387):

"The liberal rule, on the other hand, is to-day conceded, practically everywhere, to permit resort in any case to the *usage* of a *trade* or *locality*, no matter how plain the apparent sense of the word to the ordinary reader; and some of the extreme instances are persuasive to demonstrate the fallacy of ignoring the purely relative meaning of words and the injustice of attempting to enforce a supposed rigid standard."

Parol evidence, which is explanatory of the subject matter of a written contract, consistent with its terms and necessary for its interpretation, is admissible: Centenary M. E. Church v. Clime, 116 Pa. 146; Barnhart v. Riddle, 29 Pa. 92; Gould v. Lee, 55 Pa. 99; Whitesell v. Crane, 8 W. & S. 369; McCullough v. Ashbridge, 155 Pa. 166.

In considering a deed, its language is to be understood with reference to the circumstances attending it, as they stood at the time, and in view of the then existing conditions of the subject matter, and the purpose to which at that time it was applied: Sergeant v. Ingersoll, 7 Pa. 340; Wright et al. v. The Warrior Run Coal Co., 182 Pa. 514.

In view of the foregoing authorities, we are of the opinion that testimony was properly admissible to explain the meaning in the trade of the word "timber" when that word stood by itself without further explanation in the written contract. From the weight of the evidence, we conclude that the term "timber" as used, without any further definition, in this written agreement was in-

tended to mean all trees of every kind, regardless of size, growing on said tract.

As plaintiff contends that a contemporaneous parol agreement was entered into between herself and Stair, whereby defendant agreed that no trees would be cut that had a diameter of less than six inches at the top end of the butt log, the question arises as to whether parol testimony is admissible for the purpose of proving the alleged agreement.

The Supreme Court of Pennsylvania, in Gianni v. R. Russell & Co., Inc., 281 Pa. 320, and other cases since decided, in determining whether, in the absence of allegations of fraud, accident, or mistake, parol evidence is admissible to vary the terms of a written contract, has laid down the following principle:

" 'Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement': Martin v. Berens, 67 Pa. 459, 463; Irvin v. Irvin, 142 Pa. 271, 287. 'All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence': Union Storage Co. v. Speck, 194 Pa. 126, 133; Vito v. Birkel, 209 Pa. 206, 208.

"The writing must be the entire contract between the parties if parol evidence is to be excluded and to determine whether it is or not the writing will be looked at and if it appears to be a contract complete within itself 'couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing': Seitz v. Brewers' Refrigerating Machine Co., 141 U. S. 510, 517. . . .

"In cases of this kind, where the cause of action rests entirely on an alleged oral understanding concerning a subject which is dealt with in a written contract, it is presumed that the writing was intended to set forth the entire agreement as to that particular subject. 'In deciding upon this intent [as to whether a certain subject was intended to be embodied by the writing], the chief and most satisfactory index . . . is found in the circumstances whether or not the *particular element of the alleged extrinsic negotiation is dealt with at all* in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation' ".

In view of this principle, it becomes our duty to ascertain whether the parties to the said written agreement "mentioned" or "dealt with" that particular element on which the alleged parol agreement rests, to wit, the question whether there was intended to be a size limit to the trees defendant could cut.

The question of size or diameter of the timber is the sole matter of importance in the alleged parol agreement. When we turn to the written agreement to see if this subject was "mentioned" or "dealt with" therein, we conclude that it was, and that the use of the word "timber" in said written agreement, without any other qualifying terms, included all trees on the tract regardless of size, and therefore the writing presumably was meant to represent all of the transaction on that element. Therefore we conclude that parol testimony is not admissible for the purpose, and that the written contract constitutes the only agreement between the parties.

In accordance with this finding, the court concludes that defendant Stair has the right to cut and remove from said tract all trees of every kind and nature whatsoever, regardless of their size, for all salable and merchantable purposes available to him, and that the pre-

liminary injunction granted in this case should be dissolved.

The court filed with the opinion certain findings of fact and conclusions of law.

### Decree

And now, October 20, 1938, upon consideration of the foregoing case, it is ordered and decreed as follows: That the preliminary injunction is hereby dissolved and the defendant Arthur Stair shall be at liberty to cut and remove from said tract of land the trees remaining thereon, without regard to the kind or size thereof.

The costs of these proceedings to be paid by plaintiff.