ST. LOUIS SMELTING AND REFINING COMPANY, a Corporation, v. JAMES J. HOBAN and JOSEPH A. LAMBERT, d. b. a. Doing Business Under the Firm Name and Style of MIDWEST SERVICE COMPANY, Appellants.—No. 40312.—209 S. W. (2d) 119.

Division One, March 8, 1948.

*Wlbur B. Jones, George E. Fee* and *Carroll J. Donohue* for appellants; *Salkey & Jones* and *Dolle, O'Donnell & Cash* of counsel.

438

*Howard Elliott* and *Aubrey B. Hamilton* for respondent; *Boyle, Priest & Elliott* and *Martin F. Oehmke* of counsel.

[120] DALTON, C.—Action in equity for injunction, accounting and other relief. The relief prayed was granted and judgment was entered for plaintiff in the sum of $16,184.27. Defendants have appealed.

[121] On November 30, 1940, the respondent and appellants entered into a written agreement. The licensor (respondent), in consideration of certain "royalty payments" and the covenants of the licensees (appellants) as therein set out, did "license and let unto licensees so much of the surface of" 51 acres, more or less, of described real estate in Madison County, Illinois, as might be required by

licensees, for the purpose of the agreement. All subsurface and surface rights not expressly granted were reserved. The license was to continue for five years "from the date of the agreement." Licensees were "to have and to hold such premises for the purpose of crushing, sizing and otherwise preparing for market, and removing from the licensed premises, blast furnace slag on the surface of said property. Licensees agreed "to pay licensor as rent or royalty hereunder a sum equivalent to ten cents (10c) per ton of two thousand (2000) pounds of blast furnace slag removed and licensees shall pay to licensor such royalty on or before the 10th day of the month following removal thereof." Licensees agreed to keep accurate record of the slag removed. Weight, for the purpose of determining royalty, was to be based on shipments, railroad weights and other scales satisfactory to licensor. A minimum annual "rent or royalty" was provided. Licensor made "no representation as to the quantity or quality of blast furnace slag upon said premises." It was further provided that "upon expiration of this license . . . this license shall be at an end, and licensees shall surrender peaceful possession of the licensed premises."

Appellants entered upon the described premises and removed some 200,000 tons of slag and paid the royalty thereon. Prior to the expiration of the agreement, the appellants consulted respondent's manager concerning an extension of time. According to appellants' evidence, they were led to believe that an extension might be granted subject to a change in rate, but respondent's manager advised that, in the event of an unforseen change in plans, he could guarantee them at least 90 days notice before terminating the agreement.

On November 13, 1945, respondent's manager advised appellants in writing, as follows: "This will advise you that our lease agreement covering the shipment of slag from the Collinsville Dump expires on November 30th of this year. As indicated to you some time back, I am now advising that you will be permitted to continue for a period of sixty days beyond November 30, 1945. At this time it does not appear that renewal of the lease will be in order."

Thereafter, on November 29, 1945, appellants advised respondent in writing, in part as follows: "We have not as yet been able to remove all of the slag upon which you gave us a purchase option at ten (10¢) cents per ton. You have estimated that there remains approximately 500,000 tons of commercially removable slag. . . . Obviously it would be unfair for you to forfeit our rights to buy and remove the remainder merely because the slag has not been removed. Under existing conditions the removal of the remainder can be accomplished within a reasonable time, approximately three to five years depending upon the amount involved. . . . Therefore, we hand you herewith fifty thousand ($50,000.00) dollars in cash in payment of the remaining slag. . . . (payment was subject to ad-

justment if the estimated tonnage proved erroneous) . . . The plot of land on which the slag pile is located together with the means of access thereto and such as may·be occupied by us for machinery, etc., estimated at five or ten acres,.is as we know of little or no value. Nevertheless, . . . 'we will pay you the reasonable value of the use of the land . . . or . . . we will pay to you the fair market value of the land as. determined by an impartial appraisal . . .''

Appellants' proposition and the tender, supra, were promptly rejected. Appellants continued their operations and, thereafter, in January 1946, paid to respondent royalties in the sum of $319.42 on slag shipped in December 1945. On February 6, 1946, appellants forwarded a statement and check to cover royalties on shipments made in January 1946, but the statement included three cars of slag shipped subsequent to [122] January 29, 1946. Respondent refused the check, returned it to appellants and advised them that the removal of slag from the premises, after January 29, 1946, constituted a conversion of respondent's property.

Thereafter, appellants continued to dig and ship the slag from respondent's premises over respondent's protest. On February 9, 1946, respondent notified appellants' customers that appellants' right to remove slag from respondent's premises had terminated on January 29, 1946; that appellants had no title to any slag shipped after that date; and that respondent would hold the purchasers responsible.

On February 12, 1946, respondent instituted the present action seeking to enjoin the appellants from continuing to trespass on the described real estate, from continuing to remove slag therefrom "to the damage of the hereditaments of the same," and from continuing the appropriation and conversion of respondent's slag to appellants' use and purposes. Respondent further prayed an accounting for the value of slag wrongfully removed.

On March 9, and April 5, 1946, appellants tendered royalty payments covering shipments of slag in February and March, but the tenders were refused. Appellants continued operations until stopped by a temporary injunction issued by the court on May 13, 1946. Other facts will be stated in the course of the opinion.

The answers of appellants contained no affirmative pleas of title, right to possession or lawful right to proceed with the removal of the slag. The defense rests on other pleas and general denials. It was alleged (1) that the matters and things complained of were entirely within and subject to the jurisdiction of the State of Illinois, and were not cognizable in a court of equity for the reason that actions at· law could be maintained in Illinois; (2) that an injunction would be ineffective, since the operation was carried on by defendant Lambert, a resident of Ohio, who was not subject· to the jurisdiction of the court; (3) that respondent was barred from relief in equity by the "clean hands" doctrine (alleging certain facts); (4) that respondent

had an adequate remedy at law; and (5) that the law of the State of Illinois controlled the controversy and appellants relied thereon.

The trial court found that appellants' prior right to remove slag from respondent's premises had terminated on January 29, 1946; that, thereafter, appellants had no right whatsoever to remove any slag from said premises; that the appellants had deliberately, intentionally and wilfully in violation of respondent's right, continued to remove slag from said premises until May 14, 1946; that all of the appellants' actions in this respect were intentional, deliberate and unlawful without justification or excuse; that no title to real estate was involved; and that appellants were indebted to respondent for the full value of the slag so appropriated and converted by them in the sum of $16,184.27, for which sum judgment was entered against appellants.

In support of the decree the respondent insists that "equity will enjoin the wilful and deliberate action of a continuous trespasser, who, without shadow of right, spoliates real estate by repeatedly carrying away part and parcel of the land itself to the injury of the hereditaments, and converts these severed portions to his own use." Echelkamp v. Schrader, 45 Mo. 505, 508; Heman v. Wade, 74 Mo. App. 339 (quarrying rock after termination of lease); Graham v. Womack, 82 Mo. App. 618 (mining lead and zinc ore after forfeiture of lease); Bryant v. West, (Mo. Sup.), 219 S. W. 355 (landing ferry after license had terminated); Sills v. Goodyear, 80 Mo. App. 128, 132; Palmer v. Crisle, 92 Mo. App. 510; Teachout v. Clough, 143 Mo. App. 474, 127 S. W. 672; 28 Am. Jur. 326, Injunctions, Sec. 136, 137; 43 C. J. S. 525, Injunctions, Sec. 64, 65. Respondent further insists that equity acts in personam and jurisdiction of the parties gives the court jurisdiction to render an appropriate decree no matter where the subject matter may be situated. Hansen v. Duvall, 333 Mo. 59, 66, 62 S. W. (2d) 732; State ex rel. Delmar Jockey Club v. Zachritz, 166 Mo. 307, 65 S. W. 999; Olney v. Eaton, 66 Mo. 563; Burroughs v. Lasswell, (Mo. App.), 108 S. W. (2d) 705, 711; Alexander v. Tolleston Club, 110 Ill. 65, [123] 77; Cooley v. Scarlett, 38 Ill. 316; Schmaltz v. York Mfg. Co., 204 Pa. 1, 53 Atl. 522; New Jersey v. New York City, 283 U. S. 473; Mandley v. Backer, 121 Fed. (2d) 875; Phelps v. McDonald, 99 U. S. 298; 30 C. J. S. 443, Equity, Sec. 82; 19 Am. Jur. 53, Equity, Sec. 25. We do not understand appellants to question these general rules of law, but they rely on exceptions thereto.

Appellants contend that the subject matter of respondent's action was personal property physically located on real estate in Madison County, Illinois; that none of the subject matter of the action was alleged to be located in this state or within the jurisdiction of the trial court; and that the court lacked jurisdiction over the subject matter and was without authority to enter the injunction decree or determine the amount of damages. Pending the trial of the cause,

appellants applied to this court and to the St. Louis Court of Appeals for writs of prohibition. Writs were denied, but the denials did not adjudicate the jurisdictional questions involved, since there was no determination on the merits. Dahlberg v. Fisse, 328 Mo. 213, 40 S. W. (2d) 606, 611.

■ Was the blast furnace slag real or personal property? Did respondent have an adequate remedy at law in replevin or for conversion? Appellants say that one action for conversion or replevin of the entire pile of slag would afford an adequate remedy; and that "there is no suggestion in either the pleadings or in the evidence as to why legal damages and replevin are not an adequate remedy."

The evidence shows that a blast furnace or smelter for the production of pig lead and refined lead had once been located upon the described real estate; and that a bi-product known as slag was produced. "Slag is a composition of lime iron silica essentially, with lesser quantities of zinc and a small quantity of lead." It was a refuse of the smelting operations and was poured into slag pots while hot, and was transported out to the slag pile, where it was poured out. It cooled and corroded into a hard substance. When operations ceased, the slag pile extended for some distance east, north and south of the furnace location. Various gulches, low spots and irregularities in the natural surfaces of the land had been filled with slag. The area built up covered some six or eight acres and presented a relatively level surface on top. The only way to remove the slag was by blasting it out with dynamite. The amount of blasting required depended upon the nature of the slag, the weathering which had occurred and how much fracturing had resulted from freezing and· thawing. In places the slag covered the surface of the ground to a depth of 25 to 30 feet, but it was not of uniform depth, because it covered clay banks and other uneven terrain. Certain unreached sections of the dump (not regarded by respondent as covered by the agreement with appellants) could not be called "refuse slag," because of its potential value at some future time.

The trial court heard the evidence and found that the slag was real property and applied the law respecting the severance and removal of timber, clay, etc. In view of the evidence, supra, we must hold that the slag was real property; and that the parties have not treated the unsevered slag other than as real property. Compare Manson v. Dayton, 153 Fed. 258, 263. The law respecting real estate, therefore, applies. The mining, taking and carrying away of the slag from the premises, if wrongful, must be regarded as an irreparable injury for which an action for damages is an inadequate remedy. Respondent had no adequate remedy at law in replevin or for conversion on the theory that the entire slag pile was personal property.

■ Did the trial court have jurisdiction to issue an injunction to prevent appellants from digging and carrying respondent's real

property, slag, to the injury and destruction of the inheritance? Appellants' rely upon an alleged exception to the general rule which upholds the jurisdiction of a court of equity when the parties are personally within the jurisdiction and before the court and when effective [124] relief to prevent an injury to land may be granted by a decree in personam, the exception being that the court of one state or country will not assume jurisdiction of a suit that in its essentials involves merely the title or possession of land in another, and presents no ground for equitable intervention. The weight of authority seems to support the exception. The reason for the exception is that, if the action in its essence involves merely the legal title or right of possession of the land, it is essentially a *local,* and not a transitory action. Appellants rely particularly upon the statement of the exception in the annotation in 113 A. L. R. 940, 941. See, also, 28 Am. Jur. 328, Injunctions, Sec. 139; Annotations: 69 L. R. A. 689 and 7 L. R. A. (N. S.) 114. The exception is said to be analagous to the rule requiring actions for damages for trespass to land to be brought where the land is located, but even that rule is not supported by reason, only by precedent. 14 Am. Jur. 432, Courts, Sec. 239.

The exception has been assigned as a ground for denying equitable relief in many cases involving the determination of disputed titles to foreign real estate. Of course, where the principal fact involved (upon which the right to exercise the restraint depends) is that of the title to the land in question, the court will refuse to intervene even though the necessary parties are properly before it. 28 Am. Jur. 328, Injunctions, Sec. 139. Under such conditions, a court of equity will also refuse injunctive relief where the real estate is located within the state, not because the action is local or transitory, but because injunction is not the appropriate remedy to determine a disputed title or right to the possession of real estate. Mexico Refractories Co. v. Pignet's Estate, (Mo. Sup.), 161 S. W. (2d) 417, 419; Smith v. Jamison, 91 Mo. 13, 3 S. W. 212; Steele v. Allison, 228 Mo. App. 656, 73 S. W. (2d) 842.

The statement in 113 A. L. R. 941, concedes that "the extra-territorial jurisdiction of a court of equity through its jurisdiction in personam over the person of the defendant must not directly involve the title to the land, but may be exercised only if it incidentally affects the foreign land in a case otherwise within equitable cognizance, as, for instance, where there is a contract, fraud, or trust affecting the land."

In this state equitable relief by injunction will not be denied in a proper case, where title or the right to possession is only incidentally and collaterally involved. Mexico Refractories Co. v. Roberts, (Mo. Sup.), 161 S. W. (2d) 420; Mexico Refractories Co. v. Roberts, 237 Mo. App. 299, 167 S. W. (2d) 660, 662; Eaton v. Milbourn,

(Mo. App.), 135 S. W. (2d) 387. Further, the general rule is that "a right or title to property may be protected by injunction without its prior establishment at law where such right or title is admitted or where, notwithstanding a formal denial, it is clear from the facts." 43 C. J. S. 517, Sec. 55(2); Carpenter v. Grisham, 59 Mo. 247, 250; Graham v. Womack, supra; National Refining Co. v. Cox, 227 Mo. App. 778, 57 S. W. (2d) 778, 783. Whether the court had jurisdiction to issue the injunction must be determined from the particular facts of this case.

Appellants urge that "an injunction will not issue to prevent a trespass on foreign real estate, nor to eject a holdover tenant from the possession of land." We have pointed out that appellants made no affirmative plea of title or the right to possession of the described real estate. They now contend that, under the general denials in their answers, they showed a right to possession as respondent's holdover tenants. Title is not involved here, since appellants recognize respondent's title, but the claim of right to possession as holdover tenants requires an examination of the evidence and the law of Illinois on the mentioned issue. We assume, without deciding, that the agreement gave possession, rather than a mere license.

Appellants' theory is that the evidence shows they continued in possession of the premises after the expiration of the term without any new contract authorizing them to do so; that, thereafter, respondent elected to treat them as tenants on the same terms of the original lease and collected a month's rent; and that a year to year tenancy was created on the [125] terms of the original contract. Goldsborough v. Gable, 140 Ill. 269, 273. The rule relied upon does not apply where there is a new contract under which the tenant remains in possession. Weber v. Powers, 213 Ill. 370, 385; Eppstein v. Kuhn, 225 Ill. 115, 123. Appellants contend that their letter of November 29, 1945, constituted a *flat rejection* of respondent's letter granting the 60 day extension. We construe appellants' letter as a final effort to secure new arrangements satisfactory to themselves. Respondent's letter of November 13, 1945, is not mentioned or referred to. Appellants' own evidence shows that an extension was contemplated, if no long range new agreement was entered into. There is no evidence that respondent accepted the royalties on the December 1945 shipments on any basis other than the original agreement as amended by the extension notice. There is no evidence that respondent otherwise recognized appellants as holdover tenants under the original agreement. In this case the respondent submitted in writing the terms upon which appellants could remain in possession of the real estate after the end of the term. Appellants continued to occupy the premises and thereby acquiesced in the new terms. They must now be treated as subject to the original lease as amended by the notice, whether they otherwise signified an assent thereto or not.

Higgins v. Halligan, 46 Ill. 173; Sherriff v. Kromer, 232 Ill. App. 589, 593. Appellants' claim of right to possession of the Illinois real estate did not deprive the trial court of jurisdiction, since evidence shows that the respondent's right to possession was clear and certain. 43 C. J. S. 517, Sec. 55(2) and authorities, supra. On the record presented, appellants had no right of possession, but, assuming that such right was in dispute, it was only incidentally and collaterally involved here, where the jurisdiction of the court to enjoin appellants' operation of the slag pile to the irreparable damage of the land was the essential issue. Mexico Refractories Co. v. Roberts, supra, 161 S. W. (2d) 420, and 167 S. W. (2d) 660, 662; Eaton v. Milbourn, supra.

In view of our conclusions (1) that title to the described real estate is not in dispute; (2) that, on the evidence presented, respondent's right to possession is clear and certain; (3) that, in any event, the right to possession, is only incidentally and collaterally involved; (4) that the record otherwise presents facts and circumstances clearly cognizable in equity because of irreparable damage to the land and for the purpose of avoiding a multiplicity of suits; and (5) that equity, acting in personam, can give full and complete relief, it follows that the court did not err, on the grounds assigned, when issuing the injunction. See authorities, supra, on respondent's propositions. Since equity had jurisdiction, appellants were not entitled to a jury trial on the issue of damages. The case of Young v. Telephone Co., 318 Mo. 1214, 3 S. W. (2d) 381 is not inconsistent with the view here expressed.

Other assignments of error require consideration. During 1945, respondent was buying slag from appellants at $1.25 per ton and was having it shipped (a certain number of cars per week) directly to respondent's customer, Western Rock Wool Corporation. Appellants billed the cars to Western, but sent the bills of lading to respondent and invoiced the slag to respondent at $1.25 per ton. Respondent invoiced the slag to Western at $1.50 per ton and forwarded the bills of lading. The arrangement was in effect on January 29, 1946, when the extension agreement expired. The shipments were continued by appellants thereafter, but respondent did not invoice such shipments to Western, nor pay appellants therefor, because respondent did not recognize appellants' title or right to ship the slag. Respondent did forward to Western the bills of lading received from appellants and, later, agreed with Western to the diversion of certain shipments from Western to Therminsul Corporation. Respondent agreed with Western to invoice Therminsul for these shipments, but did not do so. Respondent later wrote Western that it would invoice the diverted shipments to Therminsul "at an appropriate time"; and that it would not invoice the other shipments to Western "until the litigation . . . is concluded."

[126] Appellants contend that respondent by its conduct expressly assented to and ratified the appropriation by appellants of the slag shipped to Western, waived any trespass or conversion by appellants as a result of these shipments and waived any conversion of any other shipments of slag by appellants.

The trial court did not require appellants to pay respondent for the slag invoiced by appellants to respondent and shipped to Western and Therminsul, but it did not give appellants any credit in the accounting for these shipments, which appellants contend were sales to respondent at $1.25 per ton.

Considering all of the evidence, there was no waiver of any conversion by appellants, except as to the slag actually purchased by respondent from appellants and sold to Western and Therminsul. The shipments were made after January 29, 1946, most of them while this suit was pending, and while appellants were digging and shipping the slag over respondent's protest. Appellants were not misled by respondent's action. The slag received by respondent from appellants could be used to offset the damage to respondent from appellants' continued operations and shipment of slag to others. Respondent, however, could not in effect buy and receive the slag from appellants, under the circumstances shown, without recognizing appellants' title thereto and waiving any conversion thereof. Kegan v. Park Bank, 320 Mo. 623, 8 S. W. (2d) 858, 871. Appellants are entitled to credit for the slag sold to respondent, because the evidence shows a subsequent recognition of appellants' title and right to ship this slag. The credit amounts to $4464.00, less the royalty of ten cents (10¢) per ton on 3571 tons shipped, $357.10, or to a net credit of $4106.90.

■ Appellants pleaded the ''clean hands'' doctrine of equity as a complete defense to respondent's action. In support of the defense, they offered certain oral testimony tending to sustain the proposition that respondent led appellants to believe the original agreement would be renewed or materially extended and induced appellants temporarily to discontinue operation in October 1945, and to expend funds in moving their railroad track closer to the ''toe of the slag pile,'' while respondent was secretly trying to contract with other parties. Appellants further rely on oral testimony tending to show other facts, and upon respondent's efforts, supra, to require appellants to account, in this proceeding, for slag shipped to Western and Therminsul, as evidence of ''unconscionable conduct'' barring relief in equity. It is clear from the decree that the trial chancellor totally rejected the oral testimony tending to show unconscionable conduct. The other facts shown were not sufficient to bar relief in equity. Considering the entire record presented and giving due deference to the chancellor's finding on this issue, we rule the issue against appellants.

■ Appellants offered oral testimony before the chancellor that approximately 7000 tons of slag (almost 1/3 of the slag shipped between

January 29, and May 14, 1946) had been blasted out of the pile and was ready for loading on January 29, 1946. Appellants say that this slag had been severed from the mass and appropriated physically prior to January 29, 1946; that appellants, as a matter of law, had both possession and title; and that, the court erred in failing to hold that appellants were entitled to this slag. The severed slag had not been removed from the premises and, apparently, the chancellor disbelieved the oral testimony and drew a contrary inference from other evidence. We cannot say that he should have accepted appellants' oral evidence and rejected other inferences. We defer to his finding. The case of Worthington v. Moon, 53 N. J. Eq. 46, relied upon, does not aid appellants because, even if some slag had been severed, it had not been removed and appellants were continuing to sever additional slag, giving equity jurisdiction. Further, respondent had not induced the severance and non-removal of the slag and the same equitable principles do not apply.

Appellants further contend that, under the Illinois law, they were entitled to credit for the cost of processing, loading and selling the slag after it had been severed and converted; and that the court [127] erred in refusing the credit. The McLean County Coal Co. v. Lang, 81 Ill. 359, 362; Shell Oil Co. v. Manley Oil Corp., 51 F. Supp. 21, 24; Annotation, 7 A. L. R. 930. The contention must be overruled. Appellants offered no evidence from which the cost of selling the slag could be ascertained, and no evidence from which the cost of processing and loading could be ascertained separately from the cost of severance and conversion. The evidence was that it cost appellants an average of sixty eight (68¢) cents per ton loaded "to operate on the slag pile."

The amount of the judgment, as entered, is reduced in the sum of four thousand one hundred six and 90/100 ($4106.90) dollars as of the date of the judgment. As modified the judgment should be affirmed. It is so ordered. *Bradley* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.