**PRINCETON STATE BANK (Interpleader), Frank Wayman, Administrator of the Estate of Coleman Wayman, Deceased, and Anna Wayman, Frank Wayman, Administrator of the Estate of Coleman Wayman, Deceased, Appellant,**

v.

**Anna WAYMAN, Respondent.**

No. 22078.

Kansas City Court of Appeals.

Missouri.

Oct. 4, 1954.

John E. Powell, Princeton, E. D. Morrison, Washington, Iowa, Don Chapman, Chillicothe, for appellants.

P. M. Marr, Milan, for respondent.

BROADDUS, Judge.

This suit was commenced on September 5, 1953, by the plaintiff, Princeton State Bank, filing a bill of interpleader in the Circuit Court of Mercer County. Frank Wayman, administrator of the estate of Coleman Wayman, deceased, and Anna Wayman were the named defendants. In said bill plaintiff asked the court to determine the ownership of a deposit of $6,686.65 in said bank standing in the name of "Coleman Wayman or Anna Wayman."

On September 3, 1953, Frank Wayman served written notice on the plaintiff Bank that as such administrator he claimed the account as an asset of the estate of Coleman Wayman.

On September 9, 1953, said administrator filed his interplea alleging that Coleman Wayman died intestate on August 15, 1953; that on March 3, 1948, said Coleman Wayman issued his check against his then bank account in the plaintiff bank in the sum of $10,536.70, payable to himself and Anna Wayman; that at the time said deposit was made it was not made by him in form to create a fund to pass to the survivor as provided by Section 7996, Revised Statutes of Missouri for 1939, the law then in force and effect, being Section 362.470 of the Statutes of 1949, V.A.M.S.; that at the time of said deposit or at any other time did the said Coleman Wayman ever issue any order in writing or otherwise, that the deposit or deposits should pass to the survivor of said joint account, nor did he ever at any time instruct any of the officers of said bank that said deposit was to pass to the survivor of said joint account and that, therefore, the balance of the joint account at the time of the death of Coleman Wayman, totalling $6,686.65, passed to the administrator of the estate of Coleman Wayman.

On October 5, 1953, Anna Wayman filed her interplea. In it, she alleged: "that this defendant and the said Coleman Wayman set up said account in the said Princeton State Bank for the purpose and with the intention to create a joint account to be payable to the said Coleman Wayman or this defendant, it being the intention of the said Coleman Wayman and this defendant for the survivor to be the owner of said balance, and said account was carried in said bank in the name of 'Coleman Wayman or Anna Wayman' for that purpose,

this defendant starting the account with a deposit therein of her own personal money on the 3rd day of March, 1948, in the sum of $1789.75; that after said account was set up this defendant and the said Coleman Wayman both made numerous deposits to said account of their joint earnings from the farm on which she and the said Coleman Wayman lived and where she kept house and cared for the said Coleman Wayman for many years and through his last illness; that under the law this defendant is entitled to said account, and said sum is her absolute property."

On December 15, 1953, the case came on for trial. The court sustained the bank's bill of interpleader. It also rendered judgment in favor of Anna Wayman on her interplea and against Frank Wayman, administrator of the estate of Coleman Wayman, deceased, on his interplea, and found Anna Wayman to be the sole owner of the deposit and entitled to the balance—$6,686.65. The administrator appealed.

The facts are that for many years Ed Wayman, Fred Wayman and Coleman Wayman and their sister, the respondent Anna Wayman, lived on a farm of 350 acres about three miles north of Princeton, Missouri. None of the Wayman brothers ever married. The respondent lived with them taking care of their home, an eight room house, doing their laundry, cooking, gardening, canning, and helping with their business affairs. The Wayman brothers carried their bank account in the Princeton State Bank as "Wayman Brothers." Ed and Fred died prior to 1948. Fred died first leaving all of his property to his brothers Coleman and Ed. Upon Ed's death Coleman became the owner of the Wayman Brothers' account. Anna and Coleman were living on the farm at the time of Coleman's death in August, 1953. Anna took care of her three single brothers during their last illness.

Coleman continued to carry his account in the plaintiff bank as "Wayman Brothers". The respondent Anna had her own personal account in said bank. On March 3, 1948, Anna went to the bank, and after conferring with the president and cashier, the joint account was set up in the names of "Coleman Wayman or Anna Wayman". The cashier, Bob Overton, prepared the form of the account.

Respondent Anna then by check transferred her entire personal account of $1,789.75 to the joint account. Mr. Overton, the cashier, then wrote out a check on Wayman Brothers account for the balance therein, $10,536.70, payable to Coleman Wayman or Anna Wayman, which check was signed by Coleman Wayman and returned to the bank for deposit in the joint account the next day, March 4, 1948. Neither Anna Wayman nor Bob Overton, cashier, nor John Robbins, president of plaintiff bank, were permitted to testify as to what was said by any of them at the time the joint account was set up. Their testimony in that regard was offered.

Until the death of Coleman Wayman in August, 1953, he and Anna Wayman both made deposits in the joint account including Anna's poultry, chicken and egg money, and both wrote checks thereon. Neither had any other account. For many years before and up to the time the joint account was opened Anna wrote checks on the old "Wayman Brothers" account. She offered in evidence 27 of these cancelled checks. There was no change in the manner of doing business after the joint account was set up.

In June, 1953, in a conversation with the family doctor, Dr. J. M. Perry of Princeton, Coleman Wayman said that he and Anna Wayman had a joint account and had it for some time. It was also shown that between the date of Coleman's death, August 15, 1953, and September 3, 1953 (the date appellant administrator gave notice of his claim) Anna drew five checks, totalling $977.79, on the joint account. These checks were honored by the plaintiff bank. One of them in the amount of $843.80 was for Coleman's funeral expenses.

Ten witnesses, neighbors of Anna and Coleman Wayman testified that Anna had lived with her said bachelor brothers on the farm for many years doing all the house-

work, laundry, cooking, gardening, canning, sewing, raising chickens, and helping the brothers in their business affairs, and had cared for all three of them through their final sickness.

The appellant administrator contends that the court erred in finding that respondent, Anna Wayman, was the sole owner of the balance of the deposit "because the evidence does not show any intention to create a joint account which is payable on the death of Coleman to Anna."

■ The deposit to "Coleman Wayman or Anna Wayman" does not fall within the purview of Section 362.470 RSMo 1949, V.A.M.S. It was not in "form to be paid to either, or the survivor of them". Murphy v. Wolfe, 329 Mo. 545, 45 S.W.2d 1079, 1081. Thus the presumption which that statute gives rise to that a deposit made within its purview becomes the property of the depositors as joint tenants with the attendant right of survivorship does not arise in the instant case. However, as the Murphy case says: "It may very well be that the depositor by the use of the words, 'payable to herself or G. N. Wolfe,' intended the deposits to be paid to either or the survivor of them * * *." But there being no statutory presumption, the burden was upon respondent to show by a preponderance of the evidence that the deposits were made with the intention of creating a joint tenancy therein between Coleman Wayman and herself with the right of survivorship.

It seems to us that the only purpose in setting up the joint account was to fix it so that on the death of one it would pass to the other. That the bank whose cashier had set up the form of the account, so understood the arrangement is evidenced by the fact that after the death of Coleman it honored the checks written by Anna until it was stopped by appellant's notice of September 3rd. There is not a scintilla of evidence that the joint account was set up for any other purpose. Appellant says the account was set up "for convenience," presumably to enable Anna to write checks. There is no basis for that contention what-

soever, because the evidence conclusively shows that Anna had been writing checks on the old account of "Wayman Brothers" for many years, and also making deposits therein, the same as Coleman had. They both did the same in the joint account after they merged their personal accounts therein. Thus there was no change in that respect.

In the case of Mississippi Valley Trust Co. v. Smith, 320 Mo. 989, 9 S.W.2d 58, 63, the surviving claimant, S. S. Smith, had helped the deceased Caroline Frank, open the joint account, as in the instant case, in the names of "S. S. Smith or Mrs. Caroline B. L. Frank." The court stated:

"The transaction appears from all the evidence to have borne the absolute and complete ratification of Mrs. Frank during the several years of its continuance, and, to say the least, is strongly indicative of her intention to make a completed gift and donation of the account, during her lifetime, to the respondent Smith, who acquiesced in the transaction * * *."

That statement so well applies to the case at bar. Anna helped get the joint account set up. Both made substantial initial deposits of their personal funds. The account had been in existence and used by both of them over five years at the time of Coleman's death. There was a complete ratification by Coleman during the said period. This, "to say the least, is strongly indicative of his intention to make a completed gift and donation of the account during his life time."

■ Last, but not least, we must keep in mind the situation that existed between Anna Wayman and her three bachelor brothers on that 350 acre farm. For many, many years she worked there, as testified to by ten prominent and responsible people of that community. Time took its toll, and in addition to everything else she did, she nursed her brothers Ed and Fred until the end came for them. Only she and Coleman were left there on the farm. What Anna had done for them we know that Coleman knew. We know he knew to whom he must

look for help and assistance in the home and on that farm as the shadows gathered for him. Anna had received nothing from the estates of Ed and Fred. It is reasonable to infer from all the facts and circumstances that Coleman Wayman entertained the view that he was morally, if not legally, obligated to Anna for the work she had done, for her ministrations and kindnesses and freely and willingly intended to reward her therefor by fixing a joint bank account so she could have the funds in case of his death. His statement to the old family doctor, Dr. J. M. Perry, in June before he died in August, 1953, that he and Anna had a joint account and had it for some time, is very revealing. The very statement made under the circumstances disclosed by Dr. Perry indicates beyond doubt that the fact of the joint account was of prime importance to Coleman and uppermost in his mind. Even if Coleman did not have a "proper conception of the legal meaning of a joint tenancy with all its necessary incidents," as appellant says, yet if he believed he had his bank account fixed jointly with Anna so that if he died she could draw it, that is sufficient. It is the *intention* that controls. When he told Dr. Perry about the joint account Dr. Perry remarked: "That's nice, that's a nice way to do business; that's the way my wife and I do business." Those men understood each other perfectly well. They both meant they had their business affairs fixed to take care of the survivor. That is the layman's common conception of that situation.

Appellant repeatedly states that the account was set up "for convenience only", but fails to state what convenience. There was no evidence that the account was set up for any convenience other than for the convenience of the survivor. It was not for the convenience of Anna to have a place to deposit her money, because she already had her own account she had used for that purpose for many years. Neither was it for the convenience of Coleman to have a place to deposit his money because he already had his own account used many years for that purpose. It was not for the purpose of enabling Anna to write checks on Coleman's account, because she had been doing that for many years before the joint account was opened.

In practically all of the many cases we have read on the subject the money in question belonged entirely to one of the depositors. We are impressed with the statement of the annotator in 48 A.L.R. 189 that: "A difference in principle exists, however, between a case in which the money belongs wholly to one of the parties, *and a case in which it belongs in part to each. In the latter case there is a consideration for the agreement of each to place it in the joint account* which is lacking where the money belongs wholly to one of the parties." (Emphasis ours.)

Why did Anna put her $1,789.75 into the joint account? What was the *consideration?* What "benefit or advantage," (as the cases defining "consideration" say) was she to receive? The *one* advantage the evidence points to was her right to receive the balance of the account in the event she survived her brother. There was no other.

■ Certainly it can be said that the only fair and reasonable conclusion to reach under all the facts and circumstances in this case is that Coleman and Anna, being the last ones left on the farm and very close to each other, sought to fix their separate accounts into one joint account so as to protect the survivor. If Coleman believed that he and Anna had a joint account "and had for a long time", as he told Dr. Perry, *then he intended it that way, and for the obvious purpose of protecting the survivor.* As we have said, there is no evidence of any other purpose, and the judgment of the learned trial court sustaining the interplea of Anna Wayman should be affirmed. It is so ordered.

All concur.