Walter ISON, Mable Fitzgerald, Francis C. Ison, and Clyde Ison, and Walter Ison, Administrator of the Estate of Clarence W. Ison, Deceased, Appellants,

v.

Orville ISON, Eleanor Ison and Essie C. Ison, Respondents.

No. 51957.

Supreme Court of Missouri, Division No. 2.

Jan. 9, 1967.

John M. Belisle and Morran D. Harris, Osceola, for appellants.

Poague, Brock & Wall, Barkley M. Brock, Julius F. Wall, Clinton, for respondents.

STOCKARD, Commissioner.

In August 1964, Clarence W. Ison, a bachelor, died intestate at age 63. By Count I of the petition Walter Ison, administrator of his estate, brought suit against Orville Ison and Eleanor Ison to recover $18,500 alleged to belong to Clarence's estate and to have been converted by Orville and Eleanor to their own use. By Count II of the petition Walter, and two other brothers and a sister of Clarence, sought to set aside a deed from Clarence to their mother. After trial before the court without a jury, judgment was rendered against the plaintiffs on all issues and they have appealed. However, there is no issue on this appeal as to Count II.

After living on and operating a farm in St. Clair County for many years, because of his failing eyesight, Clarence sold his farm and equipment in 1962, and with his widowed mother moved to a house he had purchased in Appleton City. Because of his blindness and the infirmities of his mother it was necessary that someone take them to purchase groceries and to the various places necessary to conduct their ordinary business affairs. This was usually done by Orville or his wife. None of the plaintiffs lived close by. Clarence was a diabetic, and in June 1964, he became seriously ill. On June 14 arrangements were made for his admission to a hospital. Clarence responded to treatment but entries on his hospital record for June 25 indicated that he appeared "despondent" and "confused." However, entries for June 27, 28 and 29 indicated that he was "alert." Dr. Jerry Feagan, a treating physician, stated that this period of

confusion, and another episode occurring a few days earlier, were probably the result of a mild insulin reaction, and that such periods of confusion usually last four or five hours.

On June 29, Orville and his wife were at the hospital, and Clarence talked to them about getting his money which was then on deposit at the Citizens Bank of Appleton City "out on interest," and he said that he wanted to talk to Mrs. Claude Elliston, a long time acquaintance who had previously assisted him with his tax returns. After Orville and his wife left the hospital they saw Mrs. Elliston and told her that Clarence wanted to talk to her, and the three of them then returned to Clarence's hospital room. Clarence and Mrs. Elliston discussed "what would be the best way, and how to fix it so that he could have some income" from his money, and Clarence suggested the use of a savings account at the Citizens Bank. During the conversation Clarence asked about making a will, and Mrs. Elliston told him that he should "consider that because if there was a will made there would be probate costs." Mrs. Elliston and Orville and his wife went to the bank, apparently to inquire about the use of a savings account, and then they returned to Clarence's room and brought with them Mrs. Freda Woods, the assistant cashier of the bank. Mrs. Woods told Clarence that the bank did not pay interest on savings accounts, and she suggested that he purchase United States Government bonds, series "H." After a discussion, pursuant to Clarence's instructions Mrs. Woods made a memorandum of the bonds he wanted to purchase. Mrs. Elliston testified that during the conversation Clarence said that he wanted Orville and his wife "to have more than the rest of them" because they had "done more than anyone else in the world for him." Mrs. Woods testified that she explained to Clarence how the bonds could be made payable, and that he gave her the names of his brothers and his sister, and first instructed her to have a thousand dollar bond issued in his name and "POD"

(which means "payable on death") to each of his brothers and his sister except Orville. He then directed her to reduce the amount as to each brother to $500, but to leave the amount for his sister at $1,000. He then directed that "H" bonds be purchased in his name, "POD" to Orville, in the amount of $6,000, and "POD" to Orville's wife in the amount of $5,000. Mrs. Woods wrote a check in the amount of $13,500 payable to the Citizens Bank, which Clarence signed, and after she returned to the bank, "H" bonds were issued as directed.

During this visit by Mrs. Woods, she and Clarence discussed his bank account. Clarence's mother had permission to write checks on his account, but according to Mrs. Elliston, Clarence said that it would be "a good idea" that Orville's name be substituted for his mother's name because "his mother's mental condition was hardly safe." Mrs. Woods testified that Clarence said "it was getting increasingly difficult for his mother to help with his affairs, * * * and he would like to have Orville's name on the bank account." She explained "how there was different ways," and according to Mrs. Woods, "he wanted it to be a joint account." Mrs. Woods had with her a card prepared by the Citizens Bank. On one side of the card were the words: "Authorized signature of," and below that a blank line. On this line Mrs. Woods wrote: "Clarence Ison or Orville M. Ison." Below this was the name of the bank, and below that in much smaller print was a statement concerning the responsibilities and duties of the bank which would be applicable to every account. There then were three lines, each labeled "Authorized signature." On these lines there appears the signatures of Orville and of Clarence. Mrs. Elliston and Mrs. Woods each signed as a witness. At the bottom of the card, in the handwriting of Mrs. Woods, appears, "Name added 6–29–64." On the reverse side of the card was the caption, "Joint Account-Payable to Either or Survivor." There then followed the terms of an agreement between the depositors providing, among other things, that

"all funds now, or hereafter, deposited in this account, are, and shall be, our joint property and owned by us as joint tenants with right of survivorship, and not as tenants in common and upon the death of either of us any balance in said account shall become the absolute property of the survivor." Following this were two lines for signatures, *but neither Clarence nor Orville signed at any place on this side of the card.* Mrs. Woods apparently took the card back to the bank. The ledger sheet shows that the account was changed from the name of Clarence with permission to his mother to write checks, to "Clarence Ison or Orville M. Ison."

Clarence left the hospital on July 1 and entered a nursing home at Butler, Missouri. A few days thereafter Clarence executed a deed to the house where he and his mother had lived whereby he conveyed title to himself and to his mother as joint tenants with right of survivorship. It was this deed that the brothers of Clarence, other than Orville, and the sister of Clarence by Count II of the petition sought to have set aside, but which is now not an issue on this appeal.

Orville wrote seven checks on the account, three before and four after Clarence's death. All were to pay bills of Clarence except the last which was in the amount of $7,440.80 and was payable to Orville. All but the last check were signed, "Clarence W. Ison by Orville M. Ison." Orville testified that he had a personal account in the same bank, and that he signed the checks in the manner he did in order to designate the account upon which the check was drawn.

The administrator of Clarence's estate contends on this appeal that he is entitled to judgment against Orville in the amount of $6,000 and against Eleanor in the amount of $5,000 "as a matter of law," and that said amounts represent "property taken by [Orville and Eleanor respectively] from the account of Clarence W. Ison and invested in U. S. Government Bonds, Series 'H', in the name of Clarence W. Ison, with [Orville and Eleanor respectively] as beneficiary."

The ownership of the United States Government Bonds is governed by the laws of the United States and the regulations of the United States Treasury Department, and on their face, they are payable to the named beneficiaries after the death of Clarence. Union Nat. Bank v. Jessell, 358 Mo. 467, 215 S.W.2d 474; Valentine v. St. Louis Union Trust Co., Mo., 250 S.W.2d 167; 91 C.J.S. United States § 126c. However, those laws and regulations do not prevent the recovery of the proceeds of the bonds if they have been purchased with fraudulently acquired funds. Union Nat. Bank v. Jessell, supra. The administrator argues that (1) the evidence of an intention on the part of Clarence to make a gift "was very vague and indefinite," (2) the donees were "active in the procurement of the said transfer;" (3) the donees exerted undue influence on Clarence; and (4) the donees were "in a fiduciary relation" and "in a position of trust and confidence" with Clarence. The only cases cited and relied on are In re Kaimann's Estate, 360 Mo. 544, 229 S.W.2d 527, and In re Patterson's Estate, Mo., 383 S.W.2d 735.

For a period of time Orville and Clarence had been partners in farming operations, but that arrangement had been terminated for several years before Clarence sold his farm and moved to town. Orville took Clarence to Kansas City six times to see an eye specialist, and he regularly took Clarence to see a local doctor. But, Clarence was blind and if he went any place he had to be taken by someone. Orville or his wife took Clarence and his mother to obtain groceries every week, and after Clarence became sick they went to see him almost daily. Orville also admitted that at times Clarence asked him to "see about things" for him, and that he asked his "judgment" on things. The nature of these requests is not shown.

There is no evidence that Orville or his wife handled Clarence's business for him,

or that he reposed confidence or trust in them as to his business affairs. They helped Clarence and his mother with their physical needs, a natural and expected activity on their part. As stated in Flynn v. Union National Bank of Springfield, Mo. App., 378 S.W.2d 1, at p. 11, "It is fairly well settled that a trust, strong affection, or a good feeling which one ordinarily reposes in a close, personal friend or relative, or in gratitude for the kind acts of a good neighbor, is not ordinarily the confidential relationship with which we are dealing." We necessarily conclude that the evidence in this case falls far short of establishing a confidential relationship on the part of either Orville or his wife with Clarence of the nature referred to in the Kaimann and Patterson cases.

▮ Neither do we find any evidence of undue influence on the part of either Orville or his wife. Mental capacity and undue influence are somewhat intertwined in that each involves a state of mind. By reason of a mild reaction to insulin Clarence had temporarily experienced some "confusion," but there was no evidence that he was experiencing this situation on June 29. When he wanted to discuss his financial affairs, although Orville and his wife were with him, he sent for Mrs. Elliston, a long time friend and business confidante. He considered making a will, but wisely or unwisely Mrs. Elliston discouraged it. He also suggested that he place his money in a savings account, but Mrs. Woods advised him that it would not bear interest, and she suggested that he buy "H" bonds. She explained to him the effect of having the bonds payable to himself and "POD" to another, and he expressed the desire that Orville and his wife "have more" of his property than the others because they had done so much for him. Clarence gave Mrs. Woods the names of those persons he wanted listed on the bonds as "POD" beneficiaries, and the amount of the bonds for each person. He signed the check prepared by Mrs. Woods and drawn on his account for the purchase of the bonds. Although Or-

ville and his wife were present during the discussions between Clarence and Mrs. Elliston and Mrs. Woods, they made no suggestions or, as far as shown by the record, exerted any influence on Clarence whatever. There is no direct evidence of undue influence and such circumstantial evidence as exists is far from sufficient to warrant an inference of undue influence. "The mere opportunity to influence, * * * unsupported by evidence showing its actual existence, is not sufficient to invalidate a deed," Walton v. Van Camp, Mo., 283 S.W. 2d 493, 502, and for the same reason would be insufficient to support the relief sought in this case as to the "H" bonds. See generally, Sebree v. Rosen, Mo., 349 S.W.2d 865; McCormack v. Berking, 365 Mo. 913, 290 S.W.2d 145. We find no reason why the intention of Clarence, as evidenced by his instructions to Mrs. Woods in the listing on the bonds of "POD" beneficiaries, should not be carried out.

We turn now to the question of whether, as to the bank account, there was created between Clarence and Orville a joint account with the right of survivorship so that upon the death of Clarence the account became the sole property of Orville.

▮ Section 362.470 RSMo 1959, V.A.M.S., relating to joint deposits in banks, provides in effect that when a deposit is made in the name of the depositor and another person and "in form to be paid to either, or the survivor of them," such deposit and any additions thereto made by either of such persons, shall become the property of such persons as joint tenants and may be paid to either during the lifetime of both, or to the survivor after the death of one of them. This section has uniformly been construed to give rise to a presumption that a deposit made within its purview becomes the property of the persons named as joint tenants, and, in the absence of competent evidence to the contrary, to actually fix the ownership of the fund in the persons named as joint tenants with the attendant right of survivorship. Jenkins v. Meyer, Mo., 380 S.W.2d 315.

See also, In re Patterson's Estate, Mo., 348 S.W.2d 6, and the cases cited at p. 8. The deposit in this case was made by Clarence, and it was in the names of "Clarence Ison or Orville M. Ison." This deposit was not in form "to be paid to either, or the survivor of them," and therefore did not comply with Section 362.470, and the statutory presumption that a joint tenancy was created does not arise. Jenkins v. Meyer, supra; Murphy v. Wolfe, 329 Mo. 545, 45 S.W.2d 1079. Therefore, the survivor has the burden of proving that the deposit was made with the intention of creating a joint tenancy. Jenkins v. Meyer, supra; Newcombe v. Farmer, Mo.App., 360 S.W.2d 272; Princeton State Bank v. Wayman, Mo.App., 271 S.W.2d 600.

Generally, in the absence of a statute pertaining to the matter, in order for a joint tenancy to be created the intent to do so must clearly be expressed by appropriate language understandingly used, McElroy v. Fluker, Mo., 265 S.W.2d 361, and where the instrument is ambiguous as to the nature of the estate or interest created, as a rule it will not be construed to create a joint tenancy. Longacre v. Knowles, Mo., 333 S.W.2d 67, 70; 48 C.J.S. Joint Tenancy § 3d, p. 918. "In most of the cases in which the question has arisen it has been held that no joint tenancy, with the right of survivorship, was created by a note or certificate of deposit providing for payment in the alternative to two or more payees." Annotation, 171 A.L.R. at p. 528. "This result is necessarily and properly reached because the language used does not indicate an intent to create a unity of interest, but on the contrary it indicates an intent that the interest of one is to be to the exclusion of the other, and there is not an equal right in both to share in the enjoyment of the property." Longacre v. Knowles, supra at p. 70. See also, Jenkins v. Meyer, supra, 380 S.W.2d at p. 321 and Hemphill v. Jackson, Mo.App., 306 S.W.2d 610, 615.

Clarence did not write the names "Clarence Ison or Orville M. Ison" on the card. Mrs. Woods did that, and as assistant cashier of the bank it may be presumed that she intentionally had Clarence and Orville sign only on the side of the card showing "Authorized signatures," and not on the side containing the terms of an agreement for a joint account with right of survivorship. Although Mrs. Woods at one time testified that Clarence "wanted it to be a joint account," this conclusion on her part is inconsistent with what she did, and is also inconsistent with other statements by her and by Mrs. Elliston to the effect that the purpose of adding Orville's name was so he could write checks to take care of Clarence's business. In addition, Orville testified unequivocally that he never asserted or claimed any interest whatever in the account as long as Clarence was living, and that until Clarence's death he considered the account to belong solely to Clarence. Orville knew of the addition of his name to the account, and the above is inconsistent with his present contention that there was created a joint account with right of survivorship.

We conclude that the addition of Orville's name to the above account had as its purpose the convenience in permitting him to write checks on Clarence's account to pay his bills, and not to create a joint account with right of survivorship.

The judgment as to Count II is affirmed, and the judgment as to Count I is reversed, and as to Count I the cause is remanded with directions to enter judgment in favor of the Administrator of the estate of Clarence Ison and against Orville Ison only in the amount of $7,440.80, and in favor of Eleanor Ison.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.