Lenora B. MELTON, Administratrix of the Estate of Leonel Elmo Melton, Deceased, Plaintiff-Respondent,

v.

Oba ENSLEY, Defendant-Appellant,

and

Joplin Federal Savings & Loan Association, a corporation, and Security National Bank of Joplin, Missouri, Defendants.

No. 8681.

Springfield Court of Appeals, Missouri.

Oct. 10, 1967.

Motion for Rehearing or to Transfer to Supreme Court Denied Nov. 2, 1967.

Application to Transfer Denied Dec. 11, 1967.

Warten, Wells & Burden, Henry Warten, Joplin, for defendant-appellant.

Dean S. Johnston, Joplin, for defendant-appellant.

Roberts & Fleischaker, Loyd Roberts, Joplin, for defendant, Joplin Federal Savings & Loan Assn.

Charles Tudor, Joplin, for defendant, Security National Bank of Joplin, Missouri.

TITUS, Judge.

L. Elmo Melton died July 20, 1966, and his sister, Lenora B. Melton, as administratrix of the estate, instituted this declaratory judgment suit in the Circuit

Court of Jasper County seeking to have the estate declared owner of a checking account, two certificates of deposit and two savings accounts. Each certificate and account was payable to decedent and Oba T. Ensley in the particular fashion we shall see anon. For brevity we frequently hereafter refer to Mr. Melton and Mrs. Ensley as Elmo and Oba. Answering the petition, Oba asseverated she and Elmo were joint owners with incident of survivorship of each account and certificate and that she became the sole owner of each upon his death. Defendants Joplin Federal Savings and Loan Association and Security National Bank, both of Joplin, Missouri, disavowed individual interest in the accounts and certificates and answered willingness to pay their obligations as determined by the court. One savings account in dispute was with the Miami Savings and Loan Association, Miami, Oklahoma, which did not appear and was not subject to the jurisdiction of the Missouri court. Following trial without jury aid, the circuit court adjudged the estate to be the owner of the certificates and accounts, and ordered each institution, including the Oklahoma association, to pay its account or certificate to the estate. When her after-trial motions were denied, Oba appealed. The aggregate value of the certificates and accounts is the amount in dispute on appeal. This is less than $15,000 and we have appellate jurisdiction. V.A.M.S.Const. art. V, §§ 3 and 13; V.A.M.S. § 477.040. In this instance we review the case on both the law and the evidence and reach our own judgment without regard to the rulings or reasoning of the trial court. V.A.M.R. 73.01(d); V.A.M.S. § 510.310, subd. 4; Edwards v. Durham, Mo., 346 S.W.2d 90, 100(7); Masterson v. Plummer, Mo.App., 343 S.W.2d 352, 354(1); Giraldin Bros. Real Estate Company v. Stiansen, Mo.App., 315 S.W.2d 636, 640(1).

Elmo was fifty-three years of age when he died and had remained unmarried following a 1947 divorce. His twenty year old adopted son, parents and two sisters reside in Joplin. In 1947 Elmo was a partner in the Wagoner Mattress Factory located near the Royal Drug Store in Joplin. Exactly when we do not know, Elmo became estranged from his parents and sisters, sold his interest in the factory to his sister, Lenora, and moved to near Neosho, Missouri, some sixteen or eighteen miles south of Joplin. He there established another mattress factory and lived alone in the building that also served as his place of business. The son resided with the grandparents. Lenora and Elmo had not been on speaking terms for six years prior to his death. While Elmo conversed with his parents, it generally was by telephone regarding untoward conduct of his son. If the matter required personal attention, Elmo went to his parents' home but "stayed outside" the house during these meetings. There was no ill feeling between Elmo and his son. Excluding the disputed accounts and certificates, the inventory filed with the probate court showed Elmo at the time of his death, to be possessed of personal property valued at $17,426.45 and real estate appraised at $6,000, all of which would descend absolutely to his son. V.A.M.S. § 474.010(2) (a).

When Oba's marriage terminated by divorce in 1949, she was employed as a saleslady by the Royal Drug Store and is still so engaged. Oba, who was from July to December older than Elmo, resides in Joplin with her mother and father, respectively seventy-five and seventy-six years of age at time of trial. The Meltons became acquainted with Oba when they frequented the drug store as customers and about 1955 or 1956 Elmo and Oba started "dating" occasionally. The "dates" increased in frequency as time passed and for several years before Elmo died their association had become almost a daily occurrence. At one time the couple discussed becoming engaged to marry, "but we had both been divorced and so we decided to stay friends." Oba was a member and regularly attended church twice on Sundays and each Wednesday night. Elmo accompanied Oba to church, "enjoyed it very much," and be-

48

came a member in 1958 or 1959. For sometime before his death, Elmo was teacher of a "teenage" Sunday school class. In late 1964 and early 1965 while being treated for pneumonia, Elmo was advised concerning a heart condition of which he never complained. He was instructed to lose weight and "watch his cholesterol count * * * For the last two years most of the time" Elmo ate meals at Oba's home prepared by her mother "because * * * he couldn't go out and eat and get the food that the doctor told him to eat." Elmo gave Oba gifts, but none in cash, and at one time was the principal contributor, along with Oba, in the purchase of a dishwasher for Oba's mother.

Elmo and his father, with Elmo paying the assessments, belonged to the "Masonic Widow's Fund" until 1958 when Elmo asked both he and his father be suspended. In August 1964 Elmo requested reinstatement for himself but not for his father. The secretary of the fund testified that in the process of reinstating Elmo, "I asked him who he would have as his beneficiary and he said 'Mrs. Oba Ensley' * * * and he said 'No relation, just a friend' * * * and he stood there for a little bit and he says 'I don't want them to have anything I have.' "

■ Any incompetency of Oba to testify in this cause because of "the deadman's statute," V.A.M.S. § 491.010, was waived when the plaintiff administratrix took her deposition. Edwards v. Durham, supra, 346 S.W.2d at 97; Ashley v. Williams, 365 Mo. 286, 281 S.W.2d 875, 880(7).

TRANSACTIONS AT THE SECURITY NATIONAL BANK

A twelve-month time certificate of deposit in the sum of $1,000 was issued November 16, 1964, by the bank payable to "L. Elmo Melton or Oba T. Ensley." The certificate, bearing four per cent interest, was automatically renewable. Elmo gave Oba the money for the certificate and asked her to take it to the bank. Oba delivered

the funds to a bank employee, Sally Harrington, who prepared the certificate in the manner she had been instructed in a telephone conversation with Elmo. Sally answered "yes, sir" to the inquiry if she had been "instructed to issue the same as a joint account in those names with right of survivorship." Fifty-one dollars accrued interest on the certificate was subsequently paid to Elmo in cash. The certificate was exchanged for a $1,000 certificate bearing 5½ per cent interest dated June 24, 1966, and made payable to "L. Elmo Melton or Oba T. Ensley."

A savings account in the name of "L. Elmo Melton or Oba T. Ensley" was opened at the bank May 4, 1965, and closed by a $1,023.49 withdrawal authorization dated February 14, 1966, signed by Elmo. The vice-president and cashier of the bank, James R. Sanders, said this withdrawal "was applied to a C.D. [certificate of deposit] with additional money." The certificate, dated February 16, 1966, was in the sum of $2,074.79 and payable to "L. Elmo Melton or Oba T. Ensley." (Dehors the record, we note the amount of the certificate equals the sum withdrawn from the savings account, the $51 interest paid Elmo on the first certificate, and $1,000.) Mr. Sanders testified Elmo "specifically asked that we make it out in his name or Mrs. Ensley," and the form used by the bank when requested to establish joint tenancies with right of survivorship in certificates of deposits, in savings accounts and checking accounts was "just with the word 'or' placed between the names." Prior to the times in question, the cashier related, "some of our girls" were putting "and/or between the signature and we did tell them to cut out the 'and' and the 'slash bar' and just put the word 'or' in, which gives the same meaning * * *"

Both of the certificates in force when Elmo died had been given to Oba by Elmo with the explanation they were "a joint account" and were in her possession at all times. Elmo had instructed the cashier at the bank "that any mail or any matter that

would be mailed out, go to Mrs. Ensley on the C.D.'s." After Elmo's death, the certificates were cancelled and replaced by two others in the respective amounts of $1,000 and $2,121.17 payable to "Oba T. Ensley or Donald C. Ensley," the latter being a son of Oba. Mrs. Ensley recounted she was assured by bank officials that in having the certificates issued "in the form shown, 'Oba T. Ensley or Donald C. Ensley' [she was] establishing and having issued * * * a time certificate of deposit in joint tenancy with right of survivorship."

The bank checking account was established May 5, 1965, in the names of "L. Elmo Melton or Oba T. Ensley," and had a $329.50 balance on the day Elmo died. Oba testified: "Elmo asked me to go down and open the account and he gave me the money to open it with. It was to be set up as a house fund account" so Elmo's tenants could deposit the rent payment in it. "It was easier" for the tenants to pay the rent into the account than to deliver it personally to Elmo. The rental property was located in Joplin and Elmo made the house mortgage payments from the account. When the account was opened Oba was given some checks and a customer identification card bearing the bank's number, the account number, and the names "L. Elmo Melton or Oba T. Ensley." Oba said, "I didn't want any of those [checks. The identification card] was enough for me to carry and I carried it in my purse."

No deposit contract or agreement was signed by Elmo or Oba relative to any account or certificate at the bank. The signature cards they did sign bore Elmo's address and social security number.

## SAVINGS ACCOUNT AT JOPLIN FEDERAL SAVINGS AND LOAN ASSOCIATION

The savings account consisted of a $4,000 deposit made June 1, 1965, a $1,000 deposit added June 10, 1965, and accumulated dividends which rendered the balance at $5,239.64 on June 30, 1966. Elmo appeared alone at the association's offices to initiate the account and the assistant secretary, Robert Moyer, handled the transaction and prepared the "Savings Account Book" and the "Joint Savings Account Signature Card." The association, Moyer testified, had "in the neighborhood" of eight types of application forms and contracts for savings accounts. "If a person comes in and asks to have two names included on an account" the joint savings account card was "not necessarily" used because it would depend upon the "withdrawal rights" desired by the depositor. Oba's name was put on the account at Elmo's direction and Moyer further said it was the practice to explain to new customers "the meaning and intendment" of the contract relating to a joint account and that he made such an explanation to Mr. Melton. Elmo secured Oba's signature to the card and contract and returned it to Joplin Federal Savings and Loan Association. The signature card, described by Moyer as being "the actual contract," was dated June 1, 1965, and prepared in the names of:

"(1) Melton, L. Elmo

(2) Ensley, Oba T."

and, in part, provided: "The undersigned hereby apply for a savings account * * * in the joint names of the undersigned as joint tenants, with the right of survivorship, and not as tenants in common * * * it being understood and agreed that anyone of the undersigned who shall first act shall have power to act in all matters related to the membership and any account in said association held by the undersigned, whether the other person or persons named in the account be living or not." The savings account book was prepared in the names of "L. Elmo Melton or Oba T. Ensley," followed with the words, "Joint owners, payable to the order of either of said joint owners, or the survivor in case of death of either of said joint owners." Elmo's address appeared on the contract and savings ledger. His social security number was also noted on the ledger.

## SAVINGS ACCOUNT AT MIAMI SAVINGS AND LOAN ASSOCIATION

The signature card and contract signed by Elmo and Oba was dated August 19, 1965, and prepared in the names of:

"A. Melton, L. Elmo

or

and

B. Ensley, Oba T.

as joint tenants with right of survivorship and not as tenants in common, and not as tenants by the entirety." The contract, inter alia, included the provision: "It is agreed by the signatory parties with each other and by the parties with [the association] that any funds placed in or added to the account by any one of the parties *are and shall be conclusively intended to be a gift and delivery* at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account." (Emphasis is as it appears in the contract).

Elmo inaugurated this account by going alone to Miami. He obtained Oba's signature to the contract and returned it to the association. The account, as of June 30, 1966, including dividends, showed a balance of $3,105.84.

Corroborated by her mother, Oba testified that shortly after each of the two savings accounts were established with the Joplin association and the Miami association, Elmo brought the savings account books to her home, "gave them to me and [said he] wanted me to have these." Oba retained possession of the two books "until shortly before Elmo passed away." The church to which Oba and Elmo belonged was contemplating a building program to be financed by loans from the congregation. Elmo and Oba discussed making such a loan and Elmo took the books with him one day "to figure out a loan for the church." The loan was not completed before Elmo died and the next Oba saw of the books was at Elmo's home on the date of his death. To the con-

trary, Elmo's mother asserted she and her husband had gone to visit Elmo shortly before he died and at that time Elmo had given her a sealed "business type envelope" and said "just to keep it, was all." Elmo did not say what was in the envelope and his mother was unaware of its contents until following Elmo's death. The envelope, Elmo's mother stated, contained the two savings account books and a copy of the by-laws of the Eastern Star, of which she was a member.

Admittedly Elmo's parents, sisters and son were wholly unaware of the existence of the disputed accounts and certificates until after he expired. The funds represented by the accounts and certificates were furnished by Elmo and he alone made income tax reports on the interest and dividends paid or accumulated thereon. Oba had not written any checks on the checking account and neither she nor Elmo had made any withdrawals or changes in the other accounts or certificates except as above noted.

There is no claim or proof of the existence of any fraud, duress, mistake, mental incapacity, undue influence or a confidential relationship. Consequently we are not concerned with the effect any one or more of such elements would have upon a contract or a gift effected in establishing a joint deposit or account. We need neither ponder what effect any such element would have upon the presumptions we recognize and note, infra. Therefore, our concern here rests primarily with (1) deposits made within the purview of the joint deposit statutes, (2) joint accounts created by the execution of joint tenancy deposit contracts, and (3) deposits made neither within the words and purview of the statutes nor accompanied by a joint tenancy contract.

Missouri joint deposit statutes are found in V.A.M.S. §§ 362.470 (banks), 363.740 (trust companies), and 369.150 (savings and loan associations). In substance these statutes provide a deposit (together with all interest thereon and any ad-

ditional deposits by either party) made in the name of the depositor and another and in form to be paid to either or the survivor, shall become the property of such persons as joint tenants and may be paid to either during the lifetime of both, or to the survivor after the death of one of them. Deposits made and accounts created within the purview of these statutes presumptively become the property of the persons named as joint tenants and, absent competent evidence to the contrary, actually fix the ownership of the funds in the persons named as joint tenants with the attendant right of survivorship. Whether the tenants' names be connected with "and" or "or" or "and/or" appears not to matter if the deposits have, in fact, been made within the statute's purview. The presumption is rebuttable and may be overcome by competent parol or other evidence showing a different intent.[1]

If establishment of the joint account be accompanied and commemorated by an integrated, unambiguous joint tenancy deposit contract of the parties, such an agreement (sans elements rendering the contract void or voidable) constitutes the single and final memorial of the intention of the parties which may not be varied or changed by parol evidence.[2] The parol evidence rule is one of substantive law and not a rule of evidence. Ergo, parol evidence cannot alter a valid contract or establish another in its stead even though injected into the cause without objection.[3] The joint tenancy deposit contract rule was first recognized in this state by Commerce Trust Company v. Watts, supra, 231 S.W.2d 817. It has been written that Jenkins v. Meyer, supra, 380 S.W.2d 315, casts doubt on Watts,[4] but with equal vehemency it is pen-

1. Ison v. Ison, Mo., 410 S.W.2d 65, 69–70(7); Leuzinger v. Merrill, Lynch, Pierce, Fenner and Smith, Mo. (Banc), 396 S.W.2d 570, 578–579(10); Jackson Savings and Loan Association v. Seabaugh, Mo.App., 395 S.W.2d 260, 263(2); Jenkins v. Meyer, Mo., 380 S.W.2d 315, 320(4); In Re Baker's Estate, Mo.App., 359 S.W.2d 238, 244(10); In Re Patterson's Estate, Mo., 348 S.W.2d 6, 7–8 (1); Dalton v. American National Bank, Mo., 309 S.W.2d 571, 579; Clay County State Bank v. Simrall, Mo.App., 259 S.W.2d 422, 424–425(3); In Re Kaimann's Estate, 360 Mo. 544, 229 S.W.2d 527, 529(2–3); Weber v. Jones, 240 Mo.App. 914, 222 S.W.2d 957, 959(1); Gordon v. Erickson, 356 Mo. 272, 201 S.W.2d 404–405(1); In Re Geel's Estate, Mo.App., 143 S.W.2d 327, 329–330(1); Melinik v. Meier, Mo.App., 124 S.W.2d 594, 597(3); Murphy v. Wolfe, 329 Mo. 545, 45 S.W.2d 1079, 1081(1); Schnur v. Dunker, Mo.App., 38 S.W.2d 282, 284(1–2); Mississippi Valley Trust Co. v. Smith, 320 Mo. 989, 9 S.W.2d 58, 63(1, 2); Ball v. Mercantile Trust Co., 220 Mo. App. 1165, 297 S.W. 415, 418(2, 3).

2. Krummenacher v. Easton-Taylor Trust Co., Mo.App., 306 S.W.2d 593, 599(1, 2); Connor v. Temm, Mo.App., 270 S.W.2d 541, 546(2); Commerce Trust Co. v. Watts, 360 Mo. 971, 231 S.W.2d 817, 820 (6); Harvey's Estate v. Huffer (Banc),

125 Ind.App. 478, 126 N.E.2d 784, 785; Burns v. Nemo, 252 Iowa 306, 105 N.W. 2d 217, 223(7); Perkins v. City National Bank of Clinton, 253 Iowa 922, 114 N.W. 2d 45, 50; In Re Estate of Smith, 199 Kan. 89, 427 P.2d 443, 446–448(3–8); Simonich v. Wilt, 197 Kan. 417, 417 P. 2d 139, 145(9, 10).

3. Hardin v. Ray, Mo.App., 404 S.W.2d 764, 767(2–4); Thies v. St. Louis County, Mo., 402 S.W.2d 376, 379; Robson v. United Pacific Insurance Co., Mo., 391 S.W.2d 855, 860(3); Frimel v. Blake, Mo.App., 360 S.W.2d 258, 261(2); Davison v. Rodes, Mo.App., 299 S.W.2d 591, 593(2); Dickinson v. Bankers Life and Casualty Co., Mo.App., 283 S.W.2d 658, 663(5); Fisher v. Miceli, Mo., 291 S.W. 2d 845, 848(3); Fischer v. Morris Plan Co., Mo.App., 275 S.W.2d 393, 395(4); Connor v. Temm, supra, 270 S.W.2d at 546–547(3, 4); Commerce Trust Co. v. Watts, supra, 231 S.W.2d at 820(7); Sol Abrahams & Son Const. Co. v. Osterholm, Mo.App., 136 S.W.2d 86, 92(1, 2); Drake & Beemont Mut. Aid Society Against F. & L. v. United States, 8 Cir., 330 F.2d 548, 552(3); National Surety Corp. v. Curators of University of Mo., 8 Cir., 268 F.2d 525, 528(2), 529–530(5).

4. "Joint Savings Account—Beware!" P. Pierre Dominique, 21 Journal of The Missouri Bar, p. 202.

ned this just isn't so.[5] Jenkins did not involve a deposit contract and did not cite nor overrule Watts. We find Watts cited in a score of Supreme Court and appellate court opinions without criticism. The Supreme Court, having given birth to Watts, is the only court with authority to chastise it if, indeed, the need should ever arise. V.A.M. S.Const. art. V, § 2; Bruno v. Murdock, Mo.App., 406 S.W.2d 294, 297(2). Unaware of any reason for affording a valid deposit contract less dignity and respect than that given other solemn agreements, we dutifully accept Watts as part of the vital case law of this state and acknowledge inability to observe incompatibility between Watts and Jenkins.

■■■ Financial institutions and depositors frequently and indiscriminately append "joint account" to accounts held by tenants in common, joint tenants with right of survivorship, tenants by the entirety, and to accounts on which an agent has authority to draw. Leuzinger v. Merrill, Lynch, Pierce, Fenner and Smith, supra, 396 S.W.2d at 579; Harrellson v. Barks, Mo.App., 326 S.W.2d 351, 360. Much of the depositing public and personnel responsible for enrolling accounts erroneously believe legal magic accompanies the use of "and" or "or" or "and/or" in joining two names on a deposit and each is endowed with a different misconception that the use of one word or the other or a combination of both, with nothing additional, will create a joint tenancy with the attendant right of survivorship. Few are cognizant of the cases treating "and" and "or" with the strictness of a grammarian or lexicographer.

Many are ignorant of tribunal trouncings give the phrase "and/or," and many would stand agape to learn all distinction is disregarded in other opinions. Where the deposit is neither made within the words or purview of the joint deposit statutes nor accompanied by a joint tenancy deposit agreement, no presumption of joint tenancy with the attendant right of survivorship arises and the burden is cast upon the survivor to show by a preponderance of the evidence the deposit was made with the intention of creating a joint tenancy. It is the intention of the depositor which controls,[6] and where there is no deposit contract or presumption of joint tenancy, the simple use of "and" or "or" or "and/or" to join names to an account does not, per se, indicate an intention to create a joint tenancy with the incident of survivorship. Where the instrument is silent or ambiguous as to the nature of the interest created it will not, as a rule, be construed to create a joint tenancy. Nevertheless, the controlling element is the intention of the parties and not the mere form in which the deposit is made. The interpretation afforded "and" or "or" or "and/or" standing alone, depends upon the particular circumstances under which they are used and should be construed to express the true intention of the parties.[7]

■■ The contract Elmo and Oba executed to establish the Joplin Federal Savings and Loan Association savings account denominated them "as joint tenants, with the right of survivorship, and not as tenants in common." There is no contention this instrument was not "the actual contract,"

---

5. "Another View of Joint Bank Accounts," Charles B. Blackmar, 21 Journal of The Missouri Bar, p. 394.

6. Ison v. Ison, supra, 410 S.W.2d at 70 (8, 9); Jenkins v. Meyer, supra, 380 S.W.2d at 320(3), 320–321(5, 6); Newcombe v. Farmer, Mo.App., 360 S.W.2d 272, 276(3); Cranford v. Langston, Mo. App., 356 S.W.2d 581, 584; Princeton State Bank v. Wayman, Mo.App., 271 S. W.2d 600, 603(1), 603–604(2); Murphy

v. Wolfe, supra, 45 S.W.2d at 1081(2, 3); 10 Am.Jur.2d, Banks, § 369, pp. 330–333; 48 C.J.S. Joint Tenancy § 3d, pp. 917–919.

7. Knox College v. Jones Store Co., Mo., 406 S.W.2d 675, 685; Longacre v. Knowles, Mo., 333 S.W.2d 67, 70–71(5, 6); The Law of Banks and Banking, by Carl Zollmann, Vol. 5, § 3223, pp. 242–244; Michie on Banks and Banking, Vol. 5A, § 46, pp. 113–118.

that it was ambiguous, or that any circumstance existed to vitiate the agreement. Application of the authorities cited in notes 2 and 3, supra, requires a ruling the contract constituted the single and final memorial of the intention of the parties which may not be varied or changed by parol evidence. As no qualifications or exceptions are urged, we feel this conclusion wholly consistent with the additional rules that all persons are presumed to know the law and the legal meaning of terms employed in establishing legal relations (31A C.J.S. Evidence § 132[1]; 29 Am. Jur.2d, Evidence § 222, p. 272–275) and a person signing a contract is conclusively presumed to know its contents and cannot be heard to say its provisions are contrary to his intentions or understanding. Burch v. Schmelig, Mo.App., 300 S.W.2d 838, 843(1); 17 C.J.S. Contracts § 137b, pp. 875–876.

But even were we to consider the signature card as lacking in the requisites of an integrated, unambiguous joint tenancy deposit contract of the parties, the savings account (as evidenced by both the contract and the savings account book) was in form to comply with and within the purview of V.A.M.S. § 369.150, thereby giving rise to the statutory presumption which, standing alone, was evidence of an intent to presently create a joint tenancy with the attendant right of survivorship. Jenkins v. Meyer, supra, 380 S.W.2d at 323. We detect no evidence which rebuts the presumption. It is true Elmo's mother (contrary to Oba's testimony) claimed that a considerable time after the savings accounts were established she received from Elmo a sealed envelope with the admonition "just to keep it, was all." Ignorant of its contents and the existence of any account Elmo had with Oba, it was not until after Elmo died his mother learned the envelope contained the two savings account books. Perchance this testimony was thought to be evidence of Elmo's change of attitude toward his parents and the accounts, but "[i]f, in a case such as this,

it becomes necessary to go beyond the written evidence of such grant or contract creating the account to establish the intention of the grantor, the inquiry should be confined to the time the contract was entered into, without reference to subsequent events or circumstances, since it is only the intention of the grantor at the time of the creation of such account that is material." Simonich v. Wilt, supra, 417 P.2d at 145(7). The testimony of Elmo's mother, even if accepted, does not rebut the presumption as to the intentions of Elmo *at the time the account was established.* Whether we apply the so-called joint tenancy deposit contract rule or rely upon the presumption arising because the savings account was within the purview of the statute, we necessarily conclude the trial court erred in not declaring Oba to be the owner of the account and by not ordering the Joplin Federal Savings and Loan Association to pay the account to her.

What we have said regarding the savings account with Joplin Federal Savings and Loan Association, applies with equal force apropos the Miami Savings and Loan Association savings account, provided the Missouri law is applicable. It seems generally agreed, however, the determination of the title to and the rights in a deposit standing in the name of the depositor and another is governed by the law of the state where the deposit has been made and the account has been kept. 10 Am.Jur. 2d, Banks § 376, pp. 339–340. The pleadings strongly suggested Oklahoma law might properly be applied to the issues on the Miami account (V.A.M.R. 55.23[b]), but the trial court and the parties disdained all effort to resolve the problem or to broach or belabor the question by brief. Fortunately we need not rule this point in conflict of laws for we believe Oba to be the owner of the Miami savings account irrespective of whether the law of Missouri or that of Oklahoma is applied.

60 Okl.St.Ann. § 74 provides "A. joint interest is one owned by several per-

sons in either real or personal property in equal shares, being a joint title created by a single instrument * * * when expressly declared in the instrument * * * to be a joint tenancy, * * * such joint tenancy * * * may be created by transfer to persons as joint tenants * * * from an owner * * * to himself and one or more persons * * *" The term "joint tenancy" had a well-defined meaning at common law which included the attendant right of survivorship and this statute used the term in its "technical common law sense." Draughon v. Wright, Adm'x, 200 Okl. 198, 191 P.2d 921, 923(1). 6 Okl.St. Ann. § 901 (banks) and 18 Okl.St.Ann. § 212b (savings and loan associations) are similar to our §§ 362.470 and 369.150, supra. The last cited Oklahoma statute permits savings and loan associations to "issue shares or membership certificates in the joint names of two or more persons or their survivor, in which event any of such persons who shall first act, shall have power to act in all matters * * * whether the other person or persons named * * be living or not. * * *" The Miami Savings and Loan Association savings account contract signed by Oba and Elmo expressly described them as "joint tenants with right of survivorship and not as tenants in common, and not as tenants by the entirety." The agreement, with its own emphasis, displayed an understanding that the funds placed in or added to the account by any of the parties *are and shall be conclusively intended to be a gift and delivery* at that time of such funds to the other party * * * to the extent of his * * * pro rata interest in the account." It is difficult to conceive how an intention to make a present gift and establish a joint tenancy could be more clearly and cogently stated. "Where donor and donee by a writing signed by them as shown by the record contains words expressing a clear and unequivocal intent on the part of the donor to make donee a joint owner and containing a survivorship clause; upon donor's death the donee is entitled to the accounts and proceeds thereof * * *" Flesher v.

Flesher, Okl., 258 P.2d 899, 900, syllabus 3 of the Court.

The savings and-loan association certificates involved in Flesher, supra, certified "Mrs. Carrie E. Cook or Abbie P. Flesher as joint owners and not as owners in common, on the death of one the survivor to become the absolute owner." The money for the certificates was provided by Mrs. Cook who thereafter gave them to Mrs. Flesher. The Oklahoma Supreme Court said (1. c. 902) : "This transaction standing alone and solely upon the writings evidencing the establishment of the joint accounts leads to but one conclusion and, that is, that Carrie E. Cook intended that the association stock * * * [was] jointly owned by herself and Abbie P. Flesher, with the right of survivorship." In Barton v. Hooker, Okl., 283 P.2d 514, 517, Miss Barton "was the owner of the funds placed in these accounts, but transferred them to herself and [her nephew] as joint tenants by a written instrument signed by both herself and [her nephew]. *We do not see what more she could have done to create* the joint tenancy." (Our emphasis). Also see, City National Bank & Trust Co. v. Conrad, Okl., 416 P.2d 942; Hadwiger v. Melkus, Okl., 365 P.2d 726.

██ Admittedly the circuit court, and hence this court, never acquired jurisdiction of the Miami Savings and Loan Association. That portion of the trial court's judgment ordering the Miami association to deliver the savings account to the estate was erroneous because it had no authority to do so and also because, as we hold, the account actually belongs to Oba T. Ensley as the surviving joint tenant of the savings account. Generally, a court may grant such relief in a declaratory judgment action as equity dictates and the proof requires (26 C.J.S. Declaratory Judgments § 160, pp. 372–374) and jurisdiction of the actual contestants herein (the estate and Mrs. Ensley) gives the court jurisdiction to render an appropriate decree binding on the parties no matter where the subject

matter may be situate. McDougal v. McDougal, Mo.App., 279 S.W.2d 731, 739(24); St. Louis Smelting & Refining Co. v. Hoban, 357 Mo. 436, 209 S.W.2d 119, 122(2).

■ The certificates of deposit issued by Security National Bank to the order of "L. Elmo Melton or Oba T. Ensley" were not within the purview of V.A.M.S. § 362.-470 nor accompanied by a contract expressing the intention of the parties. Therefore, we have no presumption of joint tenancy with the incident of survivorship and the burden was cast upon Oba to show by a preponderance of the evidence the deposits creating the certificates were made with the intention of creating a joint tenancy. See cases in notes 6 and 7, supra.

■ Missouri opinions generally hold the establishment of a joint account with right of survivorship constitutes a gift on the part of the joint depositor who contributed the money to the other depositor. "The transfer of money to or the creation of a joint account is not necessarily a gift of the entire account or all of the money there on deposit, but it is a present donation of a partial interest in the form of a right to withdraw and the right of survivorship." In Re Patterson's Estate, supra, 348 S.W.2d at 10(3, 4). Of course, if it was an absolute gift of all the money and dominion over the account no joint tenancy would remain and the many statements indicating a requirement the donor must divest himself completely of all beneficial interest and control over the account seem incongruous to the theory of joint ownership.

■ The $1,000 certificate of deposit was prepared by an employee of Security National Bank who testified Elmo had instructed her to issue it as a joint account with right of survivorship. Although obviously misinformed as to legal technicalities, the bank's cashier asserted the bank employees were told the form to use when a depositor requested a joint account with right of survivorship was "just with the word 'or' placed between the names." The

$2,074.49 certificate was issued by the cashier to the order of "L. Elmo Melton or Oba T. Ensley" as Elmo had "specifically asked." Mistaken notions of Elmo and bank personnel as to the particular form necessary to presumptively establish a joint tenancy with attendant right of survivorship, would not dilute actual evidence of Elmo's intention to create joint ownership of the certificates with Oba. Neither do we believe the fact the bank gave $51 interest to Elmo to be potently persuasive for the estate, for if the certificates were, in fact, held in joint tenancy, the bank was privileged to pay the interest "to either during the lifetime of both." V.A.M.S. § 362.470. We are mindful that before the second certificate was issued and the first was replaced by another to take advantage of "the better [interest] rate," Elmo had received an explanation of "the meaning and intendment" of a joint account and had executed two joint account contracts which set forth the elements of joint ownership. We cannot assume Elmo was ignorant of the significance of the term at the times he gave the certificates to Oba and "said it was a joint account * * * so we could both have them." That this was Elmo's intention as understood by the bank is evidenced by its conduct in cancelling the certificates after Elmo died and giving Oba new ones payable to herself and her son with the assurance the certificates payable to "Oba T. Ensley or Donald C. Ensley" constituted a joint tenancy with right of survivorship.

It was said in Napier v. Eigel, 350 Mo. 111, 164 S.W.2d 908, 911(2), " * * * that proof of intention alone, even to grant a present interest, would [not] suffice without proof of conduct showing the carrying out or fulfillment of that intention." This simply alludes to the general rule the validity of a gift is dependent upon an actual, constructive or symbolical delivery of the property to the donee. 38 C.J.S. Gifts § 18, pp. 794–797, and § 50, pp. 833–836. Here there was actual delivery by Elmo to Oba of both certificates which she accepted and

retained until after his death. Not only does this show delivery, but also constitutes additional evidence shedding light on the intention of the parties and is to be taken into consideration in determining an intent to create joint ownership in a deposit. *Michie on Banks and Banking,* Vol. 5A, Ch. 9, § 46, at 119. The actual physical delivery to Oba of the certificates of deposit in question, coupled with Elmo's instruction to the bank "that any mail or any matter that would be mailed out, go to Mrs. Ensley on the C.D.'s," evidenced an intention on the part of Elmo to relinquish the sole and exclusive control and ownership of the certificates and to cause the certificates to be jointly owned with the attendant right of survivorship.

The claim of the administratrix is based upon a matter of form. The claim of Oba is based upon a matter of true intent and substance. We are of the opinion Oba sustained her burden of proving the certificates of deposit were intended to be, and were in truth deposits in joint tenancy with the attendant right of survivorship. Except for the form employed, the evidence indicates Elmo intended there be joint ownership of the certificates. We hold the trial court erred in not declaring Oba to be the owner of the two bank certificates of deposit.

■ Our last consideration is with the checking account in Security National Bank standing in the names of "L. Elmo Melton or Oba T. Ensley." No presumption of joint tenancy accompanies this account and employment of the word "or" to join the names does not, of itself, give us a clue to what intention was involved when the account was established. The cashier did say joint accounts, including those subject to check, were put in form by the bank with "the word 'or' placed between the names." However, the record is silent as to any instructions given by Elmo that this be a joint account with right of survivorship.

All we know is that Elmo gave Oba the money for the purpose of opening the account. The account was established for the convenience of Elmo's tenants and he alone used it to make his house mortgage payments. Oba said she didn't want the checks which were given her by the bank. There is no evidence Elmo ever told Oba, or anyone, she was to have any interest in the account either during his lifetime or after his death. The simple truth of the matter is there exists a total void as to what Elmo's intentions were as regards the bank checking account, except it was established for the convenience of his tenants. In such circumstances Oba did not sustain the burden cast upon her and the trial court was correct in declaring the estate to be the sole owner of the checking account.

Although counsel approved the transcript on appeal as correct, we note errors in the judgment as reported by the transcript as to the amount of the deposit with the Miami Savings and Loan Association. We assume these to be typographical errors that will be corrected upon remand. No objection is made to the attorney fees allowed defendant Security National Bank and defendant Joplin Federal Savings and Loan Association, so that portion of the judgment relating thereto stands.

The judgment of the trial court is affirmed as regards its allowance of attorney fees to defendants Security National Bank and Joplin Federal Savings and Loan Association and as to its declaration that plaintiff is the owner of and is entitled to the said checking account in Security National Bank of Joplin. Otherwise the judgment of the trial court is reversed, and the cause remanded with directions that the trial court enter judgment in accord with the views here expressed, and costs are to be assessed in obedience to the requirements of V.A.M.R. 77.16.

STONE, P. J., and HOGAN, J., concur.